In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2282

Michael Bonds,

Plaintiff-Appellant,

v.

Milwaukee County, Karen Ordinans,
William Hart and Thomas Kuzma,

Defendants-Appellees.


Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 97 C 921--Joseph P. Stadtmueller, Chief Judge.


Argued October 14, 1999--Decided March 28, 2000


   Before Harlington Wood, Jr., Cudahy and Kanne, Circuit
Judges.

   Kanne, Circuit Judge.  Defendant Milwaukee County
argues that this is a textbook case of protected
employment action under the policymaking employee
exception to the First Amendment. Plaintiff
Michael Bonds publicly criticized his government
employer on a matter of public concern, while
serving in a "policymaking" position, and
suffered adverse employment treatment based on
his speech. Indeed, if that was the case without
more, we would apply the policymaking employee
exception first enunciated in Elrod v. Burns, 427
U.S. 347, 367-68 (1976), in a straightforward
affirmance for the County.

   The facts, however, are not so simple. While
working for the City of Milwaukee, Bonds appeared
at a public meeting and criticized a program that
the City adopted the previous day as "sinister"
and "pitting black against white." Based on this,
the County of Milwaukee rescinded its offer of
employment to Bonds. Thus, Bonds criticized the
City of Milwaukee, his government employer at the
time, but received adverse action from a
different government body, the County of
Milwaukee, for whom Bonds was to begin employment
in two weeks.

   The policymaking employee exception does not

cover a government entity's refusal to hire based on the prospective employee's criticism of a different government entity for whom he had worked. Nonetheless, we apply the balancing test of First Amendment and government employer interests from Pickering v. Board of Education, 391 U.S. 563 (1968), and find that the County's decision not to hire Bonds was justified by its interests in government efficiency and workplace harmony. We affirm judgment for the County.

I.  History

   The Community Development Block Grant Committee for the City of Milwaukee ("City") is an elected body of ten officials that makes all policy decisions regarding the distribution of Community Development Block Grant ("CDBG") funds received by the City from the federal government. Michael Bonds, who had endured a decade of postgraduate study on the CDBG program, was a natural fit as senior fiscal analyst for the Block Grant Committee. In that position, Bonds evaluated policy proposals for the distribution of CDBG funds and oversaw the allocation of $30 million in federal funding.

   In the spring of 1997, Milwaukee Mayor John Norquist proposed a novel method for the distribution of CDBG money, called the Neighborhood Strategic Planning Process ("NSPP"). The NSPP restructured the distribution process by dividing Milwaukee into seventeen service areas within each of which community groups would compete for portions of their respective area's funding allocation. Pursuant to his duties for the City, Bonds researched the NSPP and became a staunch opponent. Bonds authored a highly critical report, dated July 14, 1997, condemning the NSPP as "seriously flawed" and warning that it "pits poor people (black, white, and hispanics) on the southside of the city against those on the northside." Despite Bonds's report and amid intense public scrutiny focused on what Bonds testified was "the hottest issue in City government during that period," the City adopted the NSPP in final form on July 25, 1997.

   Unhappy with his role at the City, Bonds had been contemplating a move out of city government and had applied for employment as a research analyst with the Milwaukee County Board of Supervisors ("County" or "Board of Supervisors"). Karen Ordinans, chairperson of the Board of Supervisors, interviewed Bonds after Bill Hart, Ordinans's chief of staff, selected Bonds as one of five finalists for the position from more than seventy applicants.

   During the hour-long interview, Ordinans told

Bonds that she "expected staff to be providers of information, to be objective about the research and analysis and not get into the political part of debating issues and making policy decisions." Bonds replied that "he knew that whether he disagreed or agreed with a decision made by the County Board, that it was not his place to publicly comment on it or get into it." Impressed with Bonds's experience and demeanor, Ordinans offered the position to him around July 23, 1997. Bonds accepted her offer in a letter dated July 25, 1997, and gave the City his notice of resignation, effective August 8, 1997.

On July 26, 1997, one day after Bonds accepted the position with Milwaukee County, Bonds participated as a panelist in a "Community Brainstorming Conference" on the NSPP at the request and in place of Alderman Fred Gordon. The forum, held at a Milwaukee church, featured five speakers offering alternate viewpoints on the block grant program and the NSPP. The schedule for the forum listed Bonds as a "Community Development Policy Committee Analyst." At trial, the parties disputed the substance of Bonds's remarks at the forum, but the district court determined that Bonds was openly critical of the NSPP as "sinister" and attacked both the City, still his employer at the time, and Mayor Norquist. The Milwaukee Journal Sentinel reported these events in its July 27, 1997, edition as follows:

City analyst decries block grant funds shift

A Common Council decision to shift $660,000 in Community Development Block Grant money from north side neighborhoods to some on the south side is "sinister" and should result in an attempt to recall Mayor John Norquist if he does not veto it, a city analyst told an applauding north side audience Saturday.

"Anyone who is concerned about racial harmony should be at City Hall raising hell," said Michael Bonds, an analyst for the Block Grant Policy Committee, at a meeting Saturday of the Community Brain Storming Conference. "This is pitting black against white when we should be working together."

* * *

Bonds, who said he is quitting his city job to take a similar position with the Milwaukee County Board, was one of six panelists at the session held at St. Matthew's C.M.E. Church, 2944 N. 9th St. He urged people to call Norquist and demand that he veto the measure and to file protests with the U.S. Department of Housing and Urban

Development. He also called on African-Americans serving on the block grant task force to resign in protest.

Reports of Bonds's performance sparked immediate outrage at Milwaukee County. Two county supervisors, Daniel Diliberti and Jim McGuigan, called Ordinans to voice concerns about Bonds's future employment with the County. Diliberti testified that he left a message for Ordinans saying that he would have found it "very difficult to work with [Bonds] if he was giving his opinion or would criticize the policy-making body that he was working for." He explained, "I wouldn't want staff on the County Board that disagreed with my decision and then publicly criticize[d] me for it." McGuigan testified that he left a message for Ordinans expressing concern that Bonds was "trying to be a policymaker" and warning that the County "didn't need a 26th supervisor." Another county supervisor, Robert Krug, was "shocked" by the reports of Bonds's conduct and opined to Hart that Bonds's statements "were very wrong, and [he] would be very concerned about having somebody on staff that would be willing to make statements like that publicly in the press."

Alarmed, Hart called Bonds on July 28, 1997, to investigate the events described in the Milwaukee Journal Sentinel. Bonds told Hart that the newspaper account reported his comments out of context but admitted that the "main thrust" of the article was correct. Bonds explained that he was simply trying to inform the community about the NSPP and present it with different options for protest. Later that day, in an attempt to allay Hart's concerns, Bonds faxed several documents to Hart including a written apology to Mayor Norquist and a memorandum to the Milwaukee Common Council clarifying his comments at the forum.

Ordinans was "very shocked" by Bonds's conduct at the forum. Ordinans hired Bonds for the trusted analyst position believing that Bonds would be discreet and reserve his personal misgivings from public attention. Yet Bonds displayed "extremely poor judgment" in openly criticizing a decision of the policymaking body for which he worked and making inflammatory comments regarding a politically controversial matter on which he had worked. Ordinans felt that "if this guy is going to question the Common Council as a policy-making body, he could certainly do it again and question a policy decision that was going to be made by the Milwaukee County Board." She explained at trial that his behavior "immediately sent signals to [her] that [she] was going to have a big problem

on [her] hands if this person came on board." Indeed, Bonds's own superior Alderman Gordon was stunned by Bonds's inappropriate "diatribe" that "created a fire storm" of unwanted political controversy. Gordon explained that he had to perform "damage control" and was "besieged with phone calls" for days regarding the incident. Gordon felt that Bonds certainly spoke on his own behalf because he "never said to Mr. Bonds to criticize the process as being sinister, [he] never called for Mr. Bonds to state that the Mayor should be recalled, [he] never said anything like that."

Furthermore, Ordinans believed that Bonds would cause dissension in her workplace. Bonds's performance was widely publicized, and Ordinans felt that "the staff would have had resentment" because "[t]hey do not conduct themselves as Mr. Bonds did." Particularly given the small size of her workplace, with only seven staffers serving twenty-five supervisors, Ordinans sought "a staff that works harmoniously as a team" and needed "staff that any supervisor could feel comfortable and confident going to." Yet several county supervisors already expressed skepticism that they would be able to work with Bonds. Hart testified at trial that Bonds "would not have started his tenure at the County Board of Supervisors with a great degree of credibility, and there were Supervisors who . . . from day one would probably not trust Mr. Bonds." After considering the concerns of Diliberti, McGuigan, Krug and Hart, Ordinans decided to withdraw the offer of employment. She feared that hiring Bonds would turn out to be a "disaster" and explained at trial, "If our seven research staff were out in the community conducting themselves this way, my job would be complete chaos."

On July 31, 1997, worried that Bonds might be without a job once she withdrew her offer, Ordinans called the City to confirm that Bonds would be able to retain his job there. Satisfied that Bonds could continue with the City, Ordinans asked Hart to call Bonds and withdraw the offer of employment, which he did that day.

A week later, on August 7, 1997, Bonds sued the County in Milwaukee County Circuit Court under 42 U.S.C. sec. 1983 alleging that the County withdrew its employment offer because of Bonds's public comments on July 26, 1997, in violation of the First Amendment. Bonds also pleaded two state law claims: wrongful termination and intentional interference with a prospective contractual relationship. The County removed the suit under 28 U.S.C. sec. 1441 to the Eastern District of Wisconsin and moved for summary judgment on all three counts. On April 20, 1998, the district

court denied summary judgment on Bonds's First Amendment claim but dismissed both Bonds's state law claims. Exactly one year later on April 20, 1999, after a bench trial, the district court rendered judgment for the County on Bonds's First Amendment claim, ruling that Milwaukee County's interests as an employer outweighed Bonds's free speech interests. Bonds now appeals three district court findings of fact and the judgment against him.

II.  Analysis

A.  Findings of Fact

To begin, we address Bonds's challenge to the following district court findings of fact: (1) Bonds's comments created substantial disruption for the City; (2) Alderman Gordon viewed Bonds's comments as inflammatory and inappropriate and requested an apology from Bonds; (3) Bonds issued apologies to the Common Council and Mayor Norquist for his comments at the forum. We will reverse the district court's findings of fact only if we are convinced that those findings are clearly erroneous. See Hudson v. Burke, 913 F.2d 427, 431 (7th Cir. 1990).

None of these challenged findings constitutes clear error. Bonds contends that the first two findings are unsupported by the record, but both derive directly from the deposition testimony of Alderman Gordon. Gordon explained unequivocally in his deposition that Bonds's comments were absolutely inappropriate and sparked a "fire storm" of outrage that besieged him with phone calls for several days. Although Gordon did not testify that he demanded an apology, Gordon asked Bonds to explain himself, and Bonds immediately apologized for his remarks at the forum. Regarding the third finding of fact, Bonds argues that Bonds's letters to the Common Council and Mayor Norquist were not "apologies," but rather clarifications of his comments at the July 26 forum. Bonds's private intent notwithstanding, the district court reviewed the letters and found that these letters, which expressed Bonds's regret for his conduct at the forum, constituted apologies to the Council and the Mayor. This was not clear error.

B.  First Amendment Retaliation

Bonds's central claim on appeal is that the County violated his First Amendment rights by discriminating against him based on his speech and conduct at the July 26 community forum. Bonds's claim highlights the fact that the First Amendment places the government in two potentially conflicting roles with respect to its

public employees. The government qua government owes public employees the First Amendment protections that it owes all citizens. Although public employees once forfeited First Amendment protection by virtue of their employment with the government, see Adler v. Board of Educ., 342 U.S. 485 (1952); McAuliffe v. Mayor of New Bedford, 29 N.E. 517 (Mass. 1892), this is no longer so. Speech by government employees, completely divorced from the employment context, is protected under the same standard as speech by those who are not government employees. See Perry v. Sindermann, 408 U.S. 593, 597 (1972); Keyishian v. Board of Regents, 385 U.S. 589, 605-06 (1967). The government qua employer, however, may apply legitimate employment standards in regulating the workplace and promoting efficient operation. This often requires the government to regulate the speech of its employees in a manner that, outside the employer-employee relationship, would violate the First Amendment. In navigating between these weighty concerns, courts must balance the First Amendment against the government's interests as an employer.

The Supreme Court first framed this balance in Pickering v. Board of Education, 391 U.S. 563, 568 (1968), explaining that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Thus it is necessary to "arrive at a balance between the interests of the [citizen], in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. In evaluating a public employer's regulation of its employee's speech on matters of public concern under the First Amendment, Pickering balancing requires the court to weigh the employer's interest in government efficiency and effectiveness on one hand, and the public employee's free speech interests on the other hand.

Subsequent to Pickering, the Court developed a "policymaking employee exception" to Pickering balancing under the First Amendment. In Elrod v. Burns, 427 U.S. 347, 367 (1976), the Court held in a plurality opinion that patronage dismissals of non-policymaking employees, based on their partisan affiliation, violated the First Amendment. However, the Court also carved a narrow exception for termination based on partisan affiliation of an employee who acts "as an adviser or formulates plans for the implementation of broad goals," id. at 368, because "representative government [should] not be undercut by tactics obstructing the

implementation of policies of the new administration, policies presumably sanctioned by the electorate." Id. at 367. For these sensitive government positions, termed "policymaking" jobs, the government employer has a heightened need for trust and confidence that its subordinates are guided by the same political compass and will exercise their discretion in a manner consistent with their shared political agenda. Here, the government employer's need for political allegiance from its policymaking employee outweighs the employee's freedom of expression to such a degree that it obviates Pickering balancing.

The Court expanded this exception in Branti v. Finkel, 445 U.S. 507, 518 (1980), beyond employees with policymaking input, to any employee for whom "party affiliation is an appropriate requirement for the effective performance of the office involved." We have interpreted this definition of a policymaking employee to include positions in which "'the individual authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation.'" Warzon v. Drew, 60 F.3d 1234, 1239 (7th Cir. 1995) (quoting Nekolny v. Painter, 653 F.2d 1164, 1170 (7th Cir. 1981)). In his position with the County, Bonds would have contributed meaningful input on County policy by producing research on which the Board of Supervisors would base its decisions, and Bonds conceded that his analyst job would have constituted a "policymaking" position.

The unique facts of this case present the following question in unusually sharp relief-- whether the policymaking employee exception to the First Amendment exempts adverse employment action based on speech unrelated to political affiliation or viewpoint. While conceding his status as a "policymaker," Bonds argues that Pickering balancing applies nevertheless because his termination was not based on "political reasons" as contemplated by Elrod and Branti. In fact, the County agrees that "political reasons," defined in the usual sense, were not the basis for its decision to rescind the offer. That is, it had no objection to the substance of Bonds's statements regarding the NSPP at the July 26 forum but instead found it dismaying that Bonds chose to speak publicly against his then-employer. In the typical case, the public employer objects to the fact that the policymaking employee speaks publicly against it, but also objects to the substance of the employee's speech, namely that it contradicts and criticizes its own positions. The twist in this

case is that Bonds was not yet working for the County on July 26, and the speech at issue criticized his then-employer, the City of Milwaukee, and not the entity whose employment decision is at question here, the County. The County did not object to Bonds's speech on the basis of its viewpoint, but rather objected to the fact that Bonds publicly criticized his employer. We therefore must decide whether a refusal to hire based on political speech qualifies for the policymaking employee exception when the motivation is unrelated to political viewpoint. The district court's refusal to apply the policymaking employee exception is a question of law which we review de novo. See Selch v. Letts, 5 F.3d 1040, 1043 (7th Cir. 1993).

To date, following Elrod and Branti, we have interpreted the policymaking employee exception to exempt employer action from Pickering balancing when it is based primarily on political motivations. In addition to political affiliation, we extended the exception to cover employer action against political expression in Wilbur v. Mahan, 3 F.3d 214 (7th Cir. 1993). There, the policymaking employee exception protected a sheriff's termination of a deputy sheriff who decided to run against him in the upcoming sheriff's election. See id. at 217-18. Although the deputy sheriff belonged to the same political party as his superior, the rationale of the exception covered political expression, such as running for office against one's superior, that compromised the trust and loyalty from policymaking employees essential to government employers. We noted that the First Amendment does not require "a public official to hire, or retain, in a confidential or policymaking job, persons who are not his political friends and may be his political enemies." Id. at 218. The exception rests upon the need of a public employer to "trust the occupants of the confidential positions to keep his secrets [and] the occupants of the policymaking positions to carry out his policies with fidelity and diligence." Id. at 217. When a policymaking subordinate contests his superior's elected position in an election, "the political enmity that the candidacy is certain to engender entitles the boss to fire him." Id. at 218.

In Warzon v. Drew, 60 F.3d 1234, 1238 (7th Cir. 1995), we held that the rationale for the policymaking employee exception also covered viewpoints relating to the policymaking employee's duties. We ruled that the termination of a policymaking employee, whose duties included management of the Milwaukee County health-care plan and who openly challenged her superior's health-care policy positions, did not violate the

First Amendment. See id. Consistent with the policymaking employee exception, disagreement between the employer and the policymaking employee over job-related policy issues causes the same failure of loyalty and shared political mission between superior and subordinate as inconsistent political affiliation or viewpoint. In deference to the public employer's interests in government effectiveness and efficiency, we decided that an employer can punish policymaking employees who disagree with it on job-related policy. Id.; see also Flynn v. City of Boston, 140 F.3d 42, 47 (1st Cir. 1998); Hall v. Ford, 856 F.2d 255, 265 (D.C. Cir. 1988).

This case, however, presents a more complicated factual posture. Ordinans explained that the County chose not to hire Bonds because his remarks evidenced shortcomings of trustworthiness, propriety and loyalty to his public employer. The County conceded that Bonds's substantive viewpoint on the NSPP was basically untroubling, given its distance from the development and implementation of the program. Instead, the County viewed Bonds's speech as insubordination against his then-employer and feared that Bonds might repeat such an episode in his new job with the County.

The policymaking employee exception does not immunize public employer action unconnected to and unmotivated by need for political loyalty. For example, in Marshall v. Porter County Plan Commission, 32 F.3d 1215, 1221 (7th Cir. 1994), we held that a government employer could not terminate a policymaking employee for speech criticizing her employer's abuse of office because the speech did not involve her political or policy viewpoints. Furthermore, we explicitly have left open the question whether a government employer could cite the policymaking employee exception to limit its policymaking employees' speech unrelated to the performance of their duties. See Ryan v. Illinois Dep't of Children & Fam. Servs., 185 F.3d 751, 759 (7th Cir. 1999); Warzon, 60 F.3d at 1239 n.1; Marshall, 32 F.3d at 1221; Wilbur, 3 F.3d at 218.

Although an employee's status as a policymaker bears considerable attention when weighing the interests of the government, the policymaking employee exception does not apply and courts must apply Pickering balancing when the speech at issue does not implicate the employee's politics or substantive policy viewpoints. The policymaking employee exception does not cover all employee speech, see Wilbur, 3 F.3d at 217, and speech unrelated to job duties or political viewpoint runs too remote from the interests that animate the exception. True, Bonds's speech

addressed a controversial issue in a political setting, but the County did not decide against him for the political viewpoint of his speech. Bonds was not hired because County executives believed he was disloyal and indiscreet. The policymaking employee exception does not apply to the rescission of Bonds's job offer because the County did not withdraw its offer for "political reasons," and Pickering balancing thus applies.

Under Pickering, a government employee must satisfy the following two-part inquiry to prove unlawful discharge under the First Amendment: (1) the speech must address a matter of public concern; and (2) the employee's First Amendment interest on this matter must not be outweighed by any injury that the speech might inflict on the government interest in promoting the efficiency of its public services. See Pickering, 391 U.S. at 568. We review de novo the district court application of the Pickering test. See Messman v. Helmke, 133 F.3d 1042, 1046 (7th Cir. 1998); Hulbert v. Wilhelm, 120 F.3d 648, 653 (7th Cir. 1997).

Under the first prong of Pickering, we consider "the content, form, and context of a given statement" to determine whether Bonds's speech regarded a matter of public concern. Connick v. Myers, 461 U.S. 138, 147 (1983). Bonds addressed a subject of great public interest, and his particular statements were relevant to the public at large, not just Bonds personally. Bonds intended to provide information about the NSPP, which had been approved just a day earlier by the City and was the subject of intense public attention, at a community forum for interested citizens. This certainly constituted participation "in a public dialogue on matters of interest to the public" and discussion of "public issues rather than merely a personal grievance." Dinshow v. School Dist. of Rib Lake, 77 F.3d 194, 197 (7th Cir. 1996).

The County admits that the NSPP was a widely publicized matter of much political controversy and importance, but insists that Pickering protects speech by a government employee on a public concern only when spoken within the employee's role "as a citizen" and not "as an employee." The County argues that all Bonds's comments were made "as an employee" because he represented the City at the forum and would not have appeared but for his employment duties. According to the County, Bonds's speech is thus unprotected regardless whether it addressed a matter of public import. However, the County's proposed approach improperly places decisive weight on the fact that Bonds appeared at the forum as part of his job, without evaluating the

speech itself at all.

The cases cited by the County, which purportedly apply its approach, consider whether the employee spoke pursuant to her employment duties as a contextual factor in deciding that the relevant speech did not touch on a matter of public concern. These cases hold that speech is unprotected when the employee is not voicing her personal opinions, but instead is conveying information on behalf of another as part of her duties, see Youker v. Schoenenberger, 22 F.3d 163, 165 (7th Cir. 1994), speaking about personal grievances that relate only tangentially to a greater political issue, see David v. City & County of Denver, 101 F.3d 1344, 1355-56 (10th Cir. 1996); Thomson v. Scheid, 977 F.2d 1017, 1020-21 (6th Cir. 1992); Terrell v. University of Texas Sys. Police, 792 F.2d 1360, 1361-62 (5th Cir. 1986), or speaking without any intent to comment publicly, see Morris v. Crow, 142 F.3d 1379, 1382-83 (11th Cir. 1998) (holding that a police officer's written report and court testimony pursuant to his job duties were unprotected because the speech could not be "characterized as an attempt to make public comment"); Buazard v. Meredith, 172 F.3d 546, 548 (8th Cir. 1999). In other words, this caselaw addresses the speaker's status only insofar as it relates to the context and purpose of the speech.

Some courts have explained that the relevant inquiry is whether the employee speaks more in his role "as employee" or "as citizen." See, e.g., Wallace v. Texas Tech Univ., 80 F.3d 1042, 1050 (5th Cir. 1996). When courts refer to "speech as a citizen," it is shorthand for the constitutionally protected expression of personally-held views regarding a public concern. The underlying substantive question is whether the particular speech at issue constitutes the employee's own personal expression, intended as public comment, on a matter of public interest, rather than mere articulation of the employer's position or speech directed by a private grievance. When public employees offer their opinions in roles as representatives or employees of the government, the government's interest as an employer is greater than if the speech comes divorced from the employment context, and the second prong of Pickering should honor that enhanced interest; however, the employee's speech may qualify as speech by a citizen on a public concern under the first prong of Pickering nonetheless. Indeed, we commonly have found speech by public employees spoken pursuant to their employment duties to constitute speech on a public concern. See, e.g., Hulbert, 120 F.3d at 653-54; Campbell v. Towse, 99 F.3d 820, 828 (7th

Cir. 1996); Wright v. Illinois Dep't of Children & Fam. Servs., 40 F.3d 1492, 1503 (7th Cir. 1994). As Connick instructs, we consider the content, context and purpose of Bonds's speech at the forum as factors in deciding that his speech touched on a matter of public concern. See Connick, 461 U.S. at 147; Waters v. Churchill, 511 U.S. 661, 668 (1994) (analyzing "what the speech was, in what tone it was delivered, what the listener's reactions were" in deciding whether the speech regarded a matter of public concern).

Even though he participated in the forum at Alderman Gordon's direction, Bonds articulated many independent views about the NSPP and did not serve as a mere surrogate for Council positions. Gordon testified that Bonds spoke for himself at the forum and that Bonds's criticisms of the NSPP and the Mayor went well beyond the scope of Gordon's instructions. Indeed, this personal initiative is precisely that which troubled Ordinans and the Board of Supervisors. Bonds spoke his own mind about the wisdom underlying the NSPP, how the NSPP would affect the lives of Milwaukee citizens and how concerned citizens ought to respond politically. Bonds satisfies the first prong of the Pickering test because he commented for himself on a topic of public concern.

The second prong of Pickering presents the thornier question whether Bonds's First Amendment interests outweighed the County's interests in government efficiency and workplace harmony. Factors to consider in applying the Pickering test include (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public. See Kokkinis v. Ivkovich, 185 F.3d 840, 845 (7th Cir. 1999); Wright, 40 F.3d at 1502; Knapp v. Whitaker, 757 F.2d 827, 839 (7th Cir. 1985).

As the County stresses, Bonds appeared at the forum within the scope of his responsibilities to the City and otherwise would not have spoken there at all. This fact tempers his First Amendment interests. If Bonds had appeared simply as a surrogate for the City and said nothing on his own behalf, then his speech would be

unprotected because his personal freedom of expression would not be implicated. See, e.g., Bausworth v. Hazelwood Sch. Dist., 986 F.2d 1197, 1199 (8th Cir. 1993). However, in addition to representing the City, Bonds expressed his personal views about the NSPP at a community forum for open discussion, and personal views on a public concern are protected speech under Pickering. Furthermore, putting aside for a moment the costs and disruption caused by disclosure of sensitive government information, the public employee's opinions have particular First Amendment value for the public because his access to inside information places him in a unique position to evaluate government performance. See Waters, 511 U.S. at 674; Wilbur, 3 F.3d at 215. Bonds provided a unique perspective on the NSPP and contributed to meaningful public debate with his expert opinion on an arcane, but important City program which he had studied and researched.

This indicates that Bonds's First Amendment interests were significant, but not that they necessarily outweigh the government's interests here. In fact, we find the opposite to be true. Under Pickering, we consider among other things whether the speech would create workplace dissension; whether the employment relationship requires heightened personal loyalty and confidence; and whether the speech impedes the employee's ability to perform his responsibilities. See Wright, 40 F.3d at 1502. Bonds's status as a policymaking employee speaks to each of these factors and swings the balance in the County's favor. The special loyalty and confidentiality needed from policymaking employees like Bonds exacerbates the damage to the employment relationship and government effectiveness caused by their insubordinate, disloyal or inappropriate speech.

Although the policymaking employee exception does not apply, an employee's policymaking status therefore remains a critical factor in applying Pickering balancing. The policymaking employee exception represents a subset of Pickering cases where the government's interests so far outweigh the policymaking employee's interests that a categorical exception is appropriate. See Warzon, 60 F.3d at 1238; Marshall, 32 F.3d at 1220; Wilbur, 3 F.3d at 218-19. But see Stough v. Gallagher, 967 F.2d 1523, 1527-28 (11th Cir. 1992). The government interests advanced both by the policymaking employee exception and Pickering balancing overlap considerably. See Warzon, 60 F.3d at 1238. Under the same rationale embodied by the policymaking employee exception itself, the government employer possesses substantial latitude to punish or terminate (or in this case,

refuse to hire) policymaking employees when addressing their nonpolitical speech under Pickering.

The difference for nonpolitical speech, however, is that the policymaking employee still retains some First Amendment rights despite his policymaking status. We have explained that "[b]ecause the individual and governmental interests are essentially unvarying in patronage cases, the focus is less on the expressive activity than on the office occupied by the person engaging in that activity." Heideman v. Wirsing, 7 F.3d 659, 662 (7th Cir. 1993). In contrast, the connection between an instance of nonpolitical speech and the consequent effect on government efficiency varies considerably from one case to another. Evaluating the rich diversity of nonpolitical speech by policymaking employees under Pickering forces courts to accord First Amendment protection for speech that bears almost no relation to the demands required of policymaking employees, but permits the government appropriate latitude when the relevant speech will significantly impair the government's legitimate interests as an employer. We confer substantial weight to the employee's status as policymaker in applying Pickering to nonpolitical speech, but we also evaluate whether the employer proffers a reasonable connection between the speech and a legitimate rationale for the adverse employment action.

Bonds's speech rightly troubled the County because it had undermined his credibility with several supervisors, and Ordinans reasonably believed that his hiring would have created workplace dissension. Even though Bonds was not speaking about politics directly relevant to the County, Ordinans was concerned that Bonds would not be loyal to County policy positions because he had shown himself willing to advocate publicly his personal political views to the extent that he embarrassed his employer in explicit and provocative terms. Ordinans worried that Bonds might do the same while working for the Board of Supervisors and felt that his statements revealed him to be untrustworthy and disloyal--so much that several supervisors already had declared that they could not work with him. Particularly given the small size of the County staff, Ordinans was concerned that Bonds would disrupt workplace harmony and would be ineffective in his new position with the County as a result of the distrust surrounding him. In hiring or terminating employees, a government employer is entitled to consider "'the potential disruptiveness of an employee's speech.'" Caruso v. De Luca, 81 F.3d 666, 670-71 (7th Cir. 1996) (quoting Waters, 511 U.S. at 680); see also

Kokkinis, 185 F.3d at 845-46 (upholding termination of a police officer who publicly criticized his employer, based on potential disruptiveness of speech). Furthermore, though Bonds contends otherwise, Ordinans had reasonable grounds to believe that Bonds had conducted himself inappropriately at the forum based on the newspaper report, Hart's telephone discussion with Bonds and Bonds's written apologies to Mayor Norquist and the Council.

After considering the views of three county supervisors and her chief of staff, Ordinans concluded that hiring Bonds would become a "big problem" and a "disaster." Under these circumstances, the County's interests in government efficiency and workplace harmony justified its decision to rescind its offer to Bonds for a policymaking position and outweighed Bonds's First Amendment interests under Pickering. The alternative for the County was to hire a prospective employee for a sensitive policymaking position who it believed would be disruptive and ineffective in his new role. The County's decision not to hire Bonds because of his speech at the July 26 forum meets the Pickering standard and does not violate the First Amendment.

Finally, Bonds argues that the County's interests as an employer were not yet implicated because he had not begun working for the County. This is material only if it affects how the County rightfully could have regarded the possible effect of Bonds's hiring on efficient government operation. Admittedly, these facts are unusual, but we disagree with Bonds that this makes any difference. Courts should give substantial deference to government predictions of harm from employee speech, see Waters, 511 U.S. at 673, and the Supreme Court explained that the government's reasoning for termination based on an employee's speech should be evaluated from the vantage of the employer's reasonable belief. See Waters, 511 U.S. at 678; see also Connick, 461 U.S. at 152 ("[W]e do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action."). The operative question is whether the County can show that it was reasonable to believe that Bonds's speech would cause dissension and inefficiency in its workplace once Bonds began work. As we have discussed already, the evidence shows this to be true here.

Ordinans premised her decision not to hire Bonds on the expected future effect that Bonds's hiring and presence in the workplace would have

on office morale and government effectiveness. Ordinans reasonably felt that, if Bonds was hired, the other staffers would resent Bonds's lack of professionalism, and Hart testified that Bonds would have begun his employment at the County under a cloud of suspicion and distrust. Although Bonds had not started his employment with the County, Ordinans was justifiably concerned about the future tumult and dissension that Bonds's hiring would produce. These are legitimate interests under Pickering, and the fact that Bonds had not yet begun working at the County does not diminish them.

Conclusion

  For the foregoing reasons, we AFFIRM the judgment for Milwaukee County.

  Cudahy, Circuit Judge, dissenting.  This is certainly a case of first impression, illustrating the confusion attendant on increasingly complex elaborations of the First Amendment rights of government employees. To somehow allay confusion, we must go back to first principles in search of an answer to the puzzle.

  In that spirit I concur wholeheartedly with the majority that Mr. Bonds's comments at the ill-fated Community Brainstorming Conference addressed a subject of public concern and that therefore the analysis set forth in Pickering v. Board of Education, 391 U.S. 563 (1968), is appropriate. See also Connick v. Myers, 461 U.S. 138 (1983). That Bonds was a public employee and that he spoke on a subject within his purview as a policy analyst working for the City does not impair his rights as a citizen, so long as he expressed his own opinion on a subject that was of intense public interest. He was not complaining about the quality of the water in the office water cooler or some other "inside" matter pertaining to his working conditions, his relations with other employees or some other topic not of interest to the public at large. It may be symptomatic of the confusion that seems increasingly to be plaguing Pickering-type cases that the issue of public concern could even be raised here. Going back to first principles may mean looking at the Pickering case itself, where a high school teacher wrote a letter to the local newspaper highly critical of the way the Board of Education had handled certain bond issue proposals and its subsequent allocation of financial resources between the schools' educational and athletic programs. See Pickering,

391 U.S. at 565-67, 575-78. In many respects, including the tone of the letter as compared with the tone of Mr. Bonds's public remarks, Pickering sounds very much like the present case.

Before wrestling with the thorny legal issues, it would be helpful to put the Brainstorming Conference, at which Mr. Bonds spoke, in some perspective. This will help not only in evaluating Mr. Bonds's conduct, but also in weighing the importance to the public of protecting his right to speak. Mr. Bonds's speech dealt with a highly controversial issue with millions of dollars of public funds at stake. Holding a doctoral degree in Urban Studies (and having written his dissertation on the historical distribution of Community Development Block Grant funds in Milwaukee from 1975 to 1997), he is a foremost expert on the Community Development Block Grant process and he obviously felt deeply about it. He was therefore highly qualified to provide the public with information about this important subject, which was right at the center of public concern. The testimony of Vel Phillips--who was Milwaukee's first black, female alderman, later Wisconsin Secretary of State and a national figure--and of Reuben Harpole--long associated with higher education through the University of Wisconsin-Milwaukee--indicate the importance of Mr. Bonds's speech. These were the only trial witnesses who were actually present at the forum where Mr. Bonds spoke, and when asked to describe Mr. Bonds's demeanor at the forum, Mr. Harpole answered, "[His demeanor was] [a]lmost essentially like he acted today [at the trial]. I've known Mr. Bond [sic] for about ten years and he's always been even tempered, just . . . but he doesn't bite his tongue on the truth." Tr. at 138. See also id. at 137 (Harpole characterizing Bonds's comments as "[s]mooth, nonthreatening, but speaking the truth").

Ms. Phillips's response to a question about what actions Mr. Bonds had advocated at the forum is instructive. She said, "I was very aware at that point and he was not advocating anything. He was being very . . . He's a soft spoken man just by his general demeanor and he was not in any way excited or . . . well, he was just being very logical, very professional in his responses." Tr. at 143. According to these witnesses, Mr. Bonds's allegedly inflammatory remarks about recalling the Mayor and so on were not volunteered. They were offered in response to questions from the audience about what steps citizens could take if they disagreed with decisions about the Neighborhood Strategic Planning Process. See, e.g., Tr. at 143 (Phillips explaining that "someone asked the question what are some of the options if you think you're not getting your fair

share . . . . And [Bonds] was going through various things that you could do . . .").

With this indication of how the actual witnesses may have seen the speech, it is easier to strike the Pickering balance in a realistic way and without the credulity displayed by the majority. For, in the majority's analysis, County officials are being allowed to speculate about Bonds's future suitability for County employment with neither logic nor evidence to support their speculations. The first paradox is that Bonds was retained by the City which he supposedly grossly offended by his remarks. Neither his loyalty nor his ability to work cooperatively with his fellows has been questioned by the City. Yet the County, which he has not offended in any way, can wring its hands over Bonds's supposed disloyalty and disruptiveness. After the withdrawal of County employment, the City did not discipline or reprimand (let alone fire) Mr. Bonds. Instead, the City continued to employ him. He went on providing critical analysis for the City, and ultimately the Community Development Policy Committee and the full council accepted his concerns and modified the Neighborhood Strategic Planning Process. See Tr. at 18-19, 93-95, 221. Mr. Bonds was later promoted, receiving a $9,000 pay raise, and praised by City officials. See Tr. at 41-42, 45, 48, 222. His views were essentially vindicated but at the cost of a County job. On the other side of the scale, the majority says very little about the interest of Mr. Bonds, as a citizen, in being able to speak honestly in public about a significant matter of public concern or about the public's interest in being informed by him about a difficult matter of major importance to the public. See Pickering, 391 U.S. at 571-72.

Perhaps, on this occasion Bonds's passionate belief in his point of view caused him to speak too boldly and imprudently, but there is no showing that this has been Mr. Bonds's habit as an employee of the City or that it would be his practice at the County, where he had been specifically instructed that analysts assume a low profile. There is nothing to indicate that the City ever issued similar instructions, and, in fact, Bonds's boss, Alderman Gordon, directed him to participate in the forum. See Tr. at 27-28. Later on, the Alderman claimed in a deposition that he had received numerous telephone calls of protest at Bonds's remarks, and the findings of fact submitted by the defendants, and adopted without change by the district court, translated this as "substantial disruption" for the City. See Defendant's Proposed Findings of Fact para. 13; Tr. of Decision at 5 (adopting findings). There were

also findings about apologies requested or delivered. See Findings of Fact para.para. 11, 12. Whether there were "apologies" requested or delivered seems of only marginal relevance. If Bonds apologized for any misunderstandings or perceived excesses of rhetoric, it would speak well for his civility, but it says little about the propriety or legality of his being "unhired" by the County. The best indicator of the City's "disruption" as a result of the Bonds incident is that Bonds was not reprimanded or sanctioned by the City in any way.

The majority has in its analysis ushered the policymaking employee exception, as such, out the front door, but has let it in again by the back door--using it as a makeweight of undetermined heft in the Pickering analysis. Thus, the majority writes, "The special loyalty and confidentiality needed from policymaking employees like Bonds exacerbates the damage to the employment relationship and government effectiveness caused by their insubordinate, disloyal or inappropriate speech." Maj. op., supra, at 18. Bonds's speech here may have been "inappropriate" in part, but it was surely neither insubordinate nor disloyal. Bonds was directed by his boss to appear at the Brainstorming Conference, and pointing out the means of political action does not equate with "disloyalty." The majority ascribes to Chairman Karen Ordinans concerns that Bonds's "statements revealed him to be untrustworthy and disloyal." Maj. op., supra, at 19. All of this seems to assume that after the council vote (which went against Alderman Gordon), Bonds should have changed his tune and supported a change that both he and the Alderman had opposed, or be deemed "disloyal."

Three County supervisors--Daniel Dilberti, Jim McGuigan and Robert Krug--expressed concern about Bonds when they read the piece in the Journal Sentinel. See Maj op., supra, at 4-5. But, there was opposition to Bonds's termination: five Board members sent Ordinans a letter formally opposing the termination, see Tr. at 210-11, and four supervisors testified on Bonds's behalf at the trial, see Tr. at 97-100 (Lori A. Lutzka), 110-19 (Elizabeth Cogg-Jones), 119-130 (James Gavin White), 130-34 (Michael Mayo, Sr.). I suppose this renders Bonds "controversial" and, by the lights of some, sanctionable for his speech. However, I would guess that several (perhaps all) members of the Board of Education were upset at teacher Pickering for writing a "disruptive" letter to the newspaper. This should never be a sufficient reason for denying First Amendment protection.

The fundamental error that I see in the majority's analysis is in taking the expressed concerns of County officials at face value without requiring some showing that subjective concerns were supported by objective reality. Thus, the majority writes, "Bonds's speech rightly troubled the County because it had undermined his credibility with several supervisors, and Ordinans reasonably believed that his hiring would have created workplace dissension." Maj. op., supra, at 19. "Loss of credibility" is a pointedly subjective matter, and there are obvious problems with allowing it to vitiate constitutional rights. Freedom of speech would mean very little if one's "credibility" with the listeners were the measure of one's rights. And the majority inexplicably describes as "reasonable" Ordinans's concerns about "workplace dissension" which she based simply on what she thought Bonds's "future behavior could be." Tr. at 202. Potential problems may certainly figure in the Pickering analysis, but there must be some plausible link between what has happened in the real world and what might happen in the future. See Connick, 461 U.S. at 152 (noting that although there is no need for "an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest . . . a stronger showing may be necessary [to justify termination] if the employee's speech more substantially involved matters of public concern"). Here we have a single episode in which a speaker may have engaged in rhetorical excesses. This may indicate a too fervent commitment to a point of view, but it is pure speculation that "workplace dissension" is anywhere in sight. The majority theorizes that the small size of the County staff would contribute to bad working relations with Mr. Bonds. This is just a wild guess based on a single speech. In fact, because Bonds's comments were "in no way directed towards any person with whom [he] would normally be in contact in the course of his daily work" with the County, there is probably "no question of maintaining either discipline by immediate superiors or harmony among coworkers . . . ." Pickering, 391 U.S. at 569-70. Or, it might also be the case that the other County staffers would admire Bonds for his forthrightness and derive satisfaction from working with him. It is unlikely that failing to cancel Bonds's hiring would be a "disaster," on the theory that the County's seven-person research staff would go out in the community and conduct themselves like Bonds or that Ordinans's "job would be complete chaos." The remote possibility that other teachers might emulate Mr. Pickering in publicly critiquing Board of Education policy was no bar to First Amendment

protection for him in the Pickering case. The lesson of the present incident as viewed by the majority is that staffers are to be seen and not heard and the knowledge they have acquired after many years of diligent application is not to be shared with a public eager to be informed. They will exercise their First Amendment rights at their own (high) risk.

What was totally lacking in the Bonds case was any investigation to discover exactly in what context he made his remarks, what was his relation to Alderman Gordon, whether the Alderman directed him to make remarks on the Neighborhood Strategic Planning Process and a variety of other matters that might reflect on Bonds's alleged "insubordination" and "disruption." Ordinans did not speak with Bonds or Alderman Gordon, see Tr. at 210, nor did she speak with anyone who was actually at the Brainstorming Conference, see Tr. at 203. An investigation would have disclosed that there was no disagreement in policy between Bonds and his boss, the Alderman. Alderman Gordon, who represents a ward in the Northside African-American community and to whom Bonds directly reported, had instructed him to write the report on the Neighborhood Strategic Planning Process and had directed him to appear and to speak in his place at the Community Brainstorming Conference. See Tr. at 14-15, 19, 27. Alderman Gordon had told Bonds to provide "blunt" analysis of the Neighborhood Strategic Planning Process. Tr. at 28. The Northside audience before whom first Gordon and then Bonds was to appear was certainly expected to be sympathetic to their views.

After the speech came to the attention of Ordinans, Bonds should have been given an opportunity to tell his side of the story in detail. He did have one telephone conversation with Hart, but that seems entirely inadequate under the circumstances. If Bonds were being dropped by the City, you can be sure there would have been at the very least a thorough investigation. I see no difference between the obligation to investigate of an employer where the term of employment has yet to begin and the obligation of a current employer. In fact, at the trial, Milwaukee Common Council President Kalwitz was asked what he would have done if he were concerned about Bonds's speech. Alderman Kalwitz replied, "I would have approached Mr. Bonds and asked him under what circumstances he made those comments." Tr. at 222. The alternative to an investigation is to give full credence to every fleeting concern and every vagrant fear felt by officials of the prospective employer when they have read a brief account of an incident in the newspaper. If nothing is required of the prospective employer beyond rampant speculation,

the burden on First Amendment rights is unacceptable.

And what are the First Amendment values that are virtually ignored by the majority opinion? As has been earlier explained, Bonds's speech involved a highly controversial subject in which there was intense public interest--particularly on the Northside of Milwaukee. Millions of dollars were at stake, and Bonds was an expert who could supply the pressing need for information. One obvious purpose of the First Amendment is to keep the public informed on important subjects of public concern. See Pickering, 391 U.S. at 571-72. The result reached by the majority here will put new barriers in the path of government employees who might otherwise contribute to public enlightenment. One of the ironies of the situation is that, after being rejected by the County, Bonds went on to essentially vindicate his views in his further work for the City. The employer that did not strike out in panic at the first manifestation of Bonds's independence was thus rewarded by his further, apparently fruitful, contributions of skill and knowledge. That is why the interests both of the government employee and of the public in the employee's right to speak freely on matters of public concern may not be circumscribed on the basis of speculative and baseless fears.

Although the majority did not apply the policymaking employee exception here because it concluded that the County did not reject Bonds because of a political disagreement, a few comments on its extended discussion of the exception may be in order. It is important to recall the origins of the exception in determining whether it ought to apply. In its origins, the exception pertained to partisan differences: Republicans should not be forced to employ Democratic policymakers. See Elrod v. Burns, 427 U.S. 347, 372 (1976); see also Branti v. Finkel, 445 U.S. 507 (1980). From there it moved on to situations of electoral confrontation: a candidate should not have to employ his or her election opponent as a policymaker. See Wilbur v. Mahan, 3 F.3d 214, 217-18 (7th Cir. 1993). More recently, the exception has been extended to the taking of policy (or political) positions by a policymaker in opposition to those of his or her employer. See Warzon v. Drew, 60 F.3d 1234, 1239 (7th Cir. 1995). These are thought of as political differences of sufficient consequence to undermine the employer-employee relation of trust and confidence. This doctrine, however, in its evolution rests upon the idea--not that there is a simple disagreement on an issue between

employer and employee--but that the disagreement is fundamental enough to weaken the bond between the two, so as to destroy the efficiency and effectiveness of the working relationship. The policy difference can then be said to be a "political" rift between a public employer and its policymaking employee. As the majority puts it, "disagreement between the employer and the policymaking employee over job-related policy issues [may cause] the same failure of loyalty and shared political mission between superior and subordinate as inconsistent political affiliation or viewpoint." Maj. op., supra, at 12. This formulation should make it clear that the disagreement, in order to implicate the policymaking employee exception, must take a form from which a failure of loyalty and fidelity can reasonably be inferred as a strong probability, not a form from which such a failure would be only a possibility--something to watch for in the future.

In the present context, the exception does not apply for several reasons in addition to the one noted by the majority. First, Mr. Bonds had no policy disagreement with his relevant superior, Alderman Gordon. They both agreed that The Neighborhood Strategic Planning Process was a bad idea. Admittedly, the Common Council acted contrary to Alderman Gordon's wishes and contrary to Mr. Bonds's views, but this is hardly a policy difference that is relevant to Mr. Bonds's ability to perform his policymaking job. That Alderman Gordon was critical of Mr. Bonds's rhetoric (as opposed to the substance of his remarks) creates no policy difference implicating the policymaking employee exception.

There is another reason why the exception fails here. The basis of the policymaking exception is the idea that political antagonism may cast a doubt over the employee's fidelity and ability to work cooperatively and effectively in the policymaking role. If a single speech were enough to trigger the exception, the exception would completely swallow any First Amendment protection that would otherwise be available. It is not surprising that in none of our cases has a single incident of policy disagreement been held to be enough to justify the sanctioning of a policymaker. And this is certainly not the case to recognize such a possibility.

There was therefore no basis either under the policymaking employee exception or under Pickering balancing for the County to rescind Bonds's job. I therefore respectfully dissent.