In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 25-1896

JAMES C. WENZLER,

*Plaintiff-Appellant*,

*v.*

UNITED STATES COAST GUARD and KEVIN E. LUNDAY,

*Defendants-Appellees*.

_____

Appeal from the United States District Court for
the Western District of Wisconsin.
No. 3:23-cv-00170-jdp — **James D. Peterson,** *Chief Judge.*

_____

ARGUED APRIL 8, 2026 — DECIDED JUNE 1, 2026

_____

Before SCUDDER, ST. EVE, and KOLAR, *Circuit Judges*.

SCUDDER, *Circuit Judge*. James Wenzler posted a series of crass statements on LinkedIn while serving as a member of the Coast Guard Auxiliary and depicting himself in uniform. The Auxiliary investigated, told him to stop, and removed him from its ranks after he failed to heed its warning. Wenzler sued in federal court, alleging that the Auxiliary violated his First Amendment right to free speech. The district court

disagreed and entered summary judgment for the Auxiliary. Seeing no error, we affirm.

**I**

James Wenzler joined the Coast Guard Auxiliary in 2007. He held various positions over the years, eventually becoming a Vice Flotilla Commander. Wenzler publicized his affiliation with the organization on LinkedIn. His profile depicted him in uniform and represented that he served as the Auxiliary's Branch Chief for Human Resources.

In May 2022, a member of the public complained to the Auxiliary about Wenzler's LinkedIn posts. One of the posts accused certain Supreme Court Justices of being racist, and another included a crude remark about the Girl Scouts.

The Auxiliary's investigation resulted in District Commodore Harvey Randall issuing Wenzler a letter of caution. The letter directed Wenzler to remove from social media any photos of himself wearing his uniform and to delete any reference to positions in the Auxiliary. It also instructed Wenzler to confirm compliance with the directive.

Wenzler failed to comply. Indeed, on July 15, he emailed District Commodore Randall, stating, "I disagree with your fake Letter of Caution, and am going to file a complaint against you for your racist and bigoted action against me because I am White. I find your behavior reprehensible."

Wenzler then stayed the course. In August 2022, the Auxiliary found that his LinkedIn profile still depicted him in uniform and listed him as a Branch Chief in the Human Resources Directorate. The Auxiliary also discovered additional insensitive and insulting posts. For example, Wenzler had quipped that the President-elect of Northwestern University,

who had just been diagnosed with cancer, did a "horrible job" at the University of Wisconsin—Madison, her former employer, and "end[ed] up with the physical results of what she was" there. A member of the public saw the post and reacted negatively, asking in the comments if the Auxiliary really had put Wenzler in charge of human resources—essentially questioning whether he was fit to serve as a leader.

When the Auxiliary followed up, Wenzler doubled down. He confirmed that he had no intention of adhering to the Auxiliary's social media directive. So the Auxiliary suspended him and began a formal disciplinary process, which resulted in the Coast Guard disenrolling Wenzler.

After his administrative appeals failed, Wenzler turned to federal court. He claimed that by removing him from the Auxiliary, the Coast Guard retaliated against him for engaging in protected speech in violation of the First Amendment. The district court allowed his claim to proceed to summary judgment, ultimately ruling for the Coast Guard. It reasoned that even if Wenzler's LinkedIn posts were public speech on a matter of public concern, the Coast Guard's interest in promoting effective and efficient public service in the Auxiliary outweighed Wenzler's interest in his speech. See generally *Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968).

Wenzler now appeals.

## II

### A

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S.

410, 417 (2006). Our analysis is the same whether the speaker is a volunteer for a government organization or a paid employee. See *Harnishfeger v. United States*, 943 F.3d 1105, 1110–13 (7th Cir. 2019); see also *Mosely v. Board of Education of Chicago*, 434 F.3d 527, 534–35 (7th Cir. 2006) ("The fact that Mosely was a volunteer as opposed to a paid city employee is of little consequence to our analysis.").

To prevail on a First Amendment retaliation claim, a public employee must show that "(1) their speech was constitutionally protected; (2) they suffered a deprivation likely to deter free speech; and (3) their speech was at least a motivating factor in the employer's actions." *Bless v. Cook County Sheriff's Off.*, 9 F.4th 565, 571 (7th Cir. 2021) (cleaned up).

To determine whether speech is constitutionally protected, we apply the two-step *Connick/Pickering* test. First we ask whether the speech in question involved a matter of public concern, as opposed to a purely personal interest. See *Connick*, 461 U.S. at 147. If so, we balance the speaker's interest "in commenting upon matters of public concern" against the government's interest "in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. We have often employed a multi-factor test to aid our balancing. See *Hicks v. Ill. Dep't of Corr.*, 109 F.4th 895, 901 (7th Cir. 2024) (enumerating factors); *Bonds v. Milwaukee County*, 207 F.3d 969, 981 (7th Cir. 2000) (same). The factors are "nonexclusive," and it is not always "necessary to consider each of" them. *Schneiter v. Carr*, 148 F.4th 438, 447–48 (7th Cir. 2025).

Accepting that Wenzler's speech touched on matters of public concern, we focus only on balancing the parties' interests. On the facts before us, the Auxiliary's need for

"discipline or harmony among co-workers" and continued "public confidence" dominate. *Bonds*, 207 F.3d at 981; *Schneiter*, 148 F.4th at 449 ("Perhaps the weightiest consideration here is the degree of deference owed to the [Department of Corrections'] own assessment of the risks to its mission-critical correctional operations.").

The nature of an organization informs the deference we give in determining whether its employees' speech will deleteriously impact the organizational mission. The parties have latched onto language in our precedent identifying certain organizations as "paramilitary" and thus entitled to greater deference in this assessment. See *Kokkinis v. Ivkovich*, 185 F.3d 840, 845 (7th Cir. 1999); *Volkman v. Ryker*, 736 F.3d 1084, 1092 (7th Cir. 2013); *Hicks*, 109 F.4th at 901–02; *Schneiter*, 148 F.4th at 449. These cases considered the discretion afforded to law enforcement agencies, correctional centers, and the like. And indeed we deferred to those types of organizations' "own assessment of the risks to security and discipline." *Schneiter*, 148 F.4th at 449. But the deference in reasonably determining what type of conduct is detrimental comes from the nature of an organization and its mission. It does not stem from any separate test for whether an organization qualifies under a "paramilitary" label.

B

We are convinced that the Coast Guard Auxiliary deserves deference in assessing and responding to its members' speech when they hold themselves out as members of the organization while wearing its uniform.

Start with the Auxiliary's origins. Congress created a precursor organization called the Coast Guard Reserve in 1939,

on the brink of World War II. See Coast Guard Reserve Act of 1939, Pub. L. No. 76-243, 53 Stat. 854. The Coast Guard Reserve, whose boat-owning members participated voluntarily, resembled today's Auxiliary. Ten years later, in 1949, Congress restructured the Coast Guard Reserve and established the Coast Guard Auxiliary, arranging it much like the original Reserve. See Act of August 4, 1949, Pub. L. No. 81-393, 63 Stat. 555. The Auxiliary's enabling legislation is in Title 14 of the United States Code alongside that of the Coast Guard itself. 14 U.S.C. §§ 101, 3901.

Consider also the Auxiliary's structure and appearance. "For command, control, and administrative purposes," Congress gave the Auxiliary a military-like hierarchy consisting of "a national board and staff …, districts, regions, divisions, flotillas, and other organizational elements and units." 14 U.S.C. § 3901(a). The Commandant of the Coast Guard, who is nominated by the President, administers the Auxiliary. See *id.* §§ 302, 3901(a). "The Auxiliary is a uniformed" organization, 33 C.F.R. § 5.3(a), and "Auxiliarists are authorized to wear Coast Guard uniforms with the appropriate Auxiliary insignia" on them, with some exceptions. U.S. Coast Guard, Auxiliary Manual, COMDTINST M16790.1G, ch. 1, § A.4.a (2011); see *id.* ch. 10, Introduction ("Silver braid and silver buttons replace the gold braid and buttons worn by Coast Guard officers."). The Coast Guard also encourages awarding medals to Auxiliarists, to be worn on their uniforms in recognition of their service. See *id.* ch. 11, Introduction.

The Auxiliary's possible missions are substantial. As a constitutional matter, the President, as Commander in Chief, may direct the Commandant to request and authorize assistance from the Auxiliary. U.S. Const. art. II, § 2, cl. 1. As a

statutory matter, the Auxiliary may "assist the Coast Guard as authorized by the Commandant, in performing any Coast Guard function, power, duty, role, mission, or operation authorized by law." 14 U.S.C. § 3902(a). This includes the ability to "conduct a patrol of a waterway" if certain preconditions are met. *Id.* § 3902(b). And while Auxiliarists may not "engage in direct law enforcement or military missions" or "enforce limited access areas," they "may advise the public regarding compliance with [a] limited access area." 33 C.F.R. § 5.20(c). Auxiliarists may also serve as "unarmed opposition forces" during training exercises as well as "gather information and data for the development of Coast Guard, State, and local government contingency plans." Auxiliary Manual, ch. 2, § B.7. Congress further recognized that some missions could place Auxiliarists at risk and therefore provided benefits to those who are "physically injured or die[] as a result of physical injury incurred while performing any duty" assigned to them by the Coast Guard. 14 U.S.C. § 3913.

For his part, Wenzler sees the Auxiliary in more limited terms, as only a volunteer "nonmilitary organization" where members elect their own leadership and may not carry weapons. *Id.* § 3901; Auxiliary Manual, ch. 5, § Q.1; 33 C.F.R. § 5.5(b). He tells us that the Auxiliary is nothing more than a "government-sponsored fraternity." We cannot agree. By statute, Congress established the Auxiliary and made it a component of the Coast Guard and thus, at least indirectly, answerable to the Commandant of the Coast Guard. See 14 U.S.C. § 3902.

Wenzler also contends that because the Auxiliary lacks the means to compel obedience from its members it should receive no deference in policing their speech. Here, too, we

disagree. Even in the actual armed forces of the United States, earning the privilege to lead has always required buy-in from subordinates. See Seanegan P. Sculley, *Contest for Liberty: Military Leadership in the Continental Army, 1775–1783* 38 (2019) ("The authority from which the officer derived his ability to lead soldiers, the basis for his legitimacy as a leader, trended away from civilian social status toward a political foundation based largely, at the ranks below regimental commander, on merit and *consensus*." (emphasis added)); see also Headquarters, U.S. Dep't of the Army, Army Doctrine Publication 6-22: Army Leadership and the Profession (2025) ("As *consensus* builds, adaptive leaders influence the course of the organization." (emphasis added)). Given its statutory scheme and enabling regulations, we are convinced that the Auxiliary deserves deference in its reasonable determinations of how its members' speech will impact its mission.

C

Accounting for the nature of the Auxiliary, we conclude under *Connick/Pickering* that its interests outweigh Wenzler's. To serve its purpose, the Auxiliary must be able to count on its members to perform their assigned duties, including professionally performing leadership responsibilities. And "[a] public employer's reputational interests are a valid part of the balancing inquiry." *Schneiter*, 148 F.4th at 449.

Given the uncontested facts before us, the Auxiliary could have reasonably determined that Wenzler's speech and actions would be detrimental to the Auxiliary and its reputation. He served in a leadership role and the example he set mattered. The Auxiliary could have reasonably expected that other Auxiliarists would be less likely to work with Wenzler, or at least to work well with him, following his derogatory

comments and attacks on others. See *id.* ("[A] public employer may act based on potential disruption so long as its predictions are reasonable." (cleaned up)). Wenzler's statements alarmed at least two members of the public enough to notify the Auxiliary. On this record, the Auxiliary could have been justifiably concerned about negative impacts to its reputation and, in turn, its recruiting and retention. In the long run, its ability to serve the public might suffer, or at least the Auxiliary could have reasonably believed so.

The district court properly found that the Coast Guard's reasonable determination that Wenzler's speech could undermine the Auxiliary's mission outweighed his interest in the statements he made. We see no error in its conclusion that the Auxiliary did not violate the First Amendment by separating Wenzler.

For these reasons, we AFFIRM.