In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-3444

RICHARD CHAKLOS and ANDREW WIST,

*Plaintiffs-Appellant*s,

*v.*

KATHLEEN STEVENS, MICHAEL SHEPPO,
DONNA METZGER, and SUSAN VONDRAK,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 06 C 4063—**J. Phil Gilbert**, *Judge*.

ARGUED SEPTEMBER 22, 2008—DECIDED MARCH 30, 2009

Before EASTERBROOK, *Chief Judge*, and ROVNER and
WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. When Richard Chaklos and
Andrew Wist discovered that the State of Illinois was
going to pay an out-of-state organization $750,000 to
train forensic scientists without first soliciting competi-
tive bids, they decided to take action and try to save the

taxpayers some money. They submitted a letter protesting the State's decision not to solicit bids and proposing to provide the same training services for a lower price through their own company. At the time, however, the State employed Chaklos and Wist to train forensic scientists. (They had formed their training company on the side.) Their supervisors (defendants) were taken aback by this letter and suspended Chaklos and Wist, who claim the suspension violated their First Amendment rights.

Without deciding whether this amounts to a constitutional violation, we hold that defendants are entitled to qualified immunity because the law does not make clear that their action was unconstitutional. *See Pearson v. Callahan*, 129 S. Ct. 808 (2009). Although some statements in the letter (those regarding Chaklos and Wist's own proposal for the state contract) do not rise to the level of public concern, we conclude that, in main part, the letter addresses wasteful government spending, which is a matter of public concern. However, it is not obvious whether Chaklos and Wist's interest in making such speech outweighs their employer's interest in efficient service. Due to several unusual facts in this case, resolving the issue entails fine line-drawing, the very nature of which entitles defendants to immunity. Therefore, we affirm the grant of summary judgment in defendants' favor.

## I. BACKGROUND

In January 2004, the State of Illinois allocated money to process a backlog of DNA evidence from rape victims

that had not been tested due to a shortage of forensic scientists at the Illinois State Police Crime Lab. The Illinois State Police (ISP) received money to hire and train 14 (later 15) new forensic scientists. This case arises from ISP's plan to use some of that money.

Plaintiffs, Chaklos and Wist, were employed by ISP to train forensic scientists. Wist trained scientists in DNA analysis and Chaklos trained scientists in drug chemical analysis. Shortly after the governor of Illinois approved ISP's request to hire additional scientists, members of ISP's Forensic Sciences Command discussed how best to train the new scientists. They ultimately decided to hire the National Forensic Science Training Center (NFSTC), a not-for-profit company located in Florida. Although NFSTC had conducted training for ISP personnel at no cost to the State of Illinois in the past, this training was projected to cost the State nearly $750,000.

The State of Illinois encourages competitive bidding for state contracts and purchases. However, contracts can be awarded on a "sole source" or "no-bid" basis (rather than competitively bid) if there is only one economically feasible source able to meet the requirements of the contract. In this case, although several people at ISP thought the training contract should be competitively bid, the Director of ISP recommended the contract be sole-sourced based on the recommendation of Susan Vondrak (Director of Training of ISP's Forensic Sciences Command), Donna Metzger (Assistant Commander), and Kathleen Stevens (Deputy Director of the Forensic Services Command).

Chaklos and Wist became upset when they heard about the contract. Wist had participated in some discussions regarding NFSTC's involvement in the training but had done so under the belief that its training services would be free of cost to the State. Wist had also discussed alternative options such as training the new scientists internally rather than outsourcing the training. When he discovered that the State was paying for the services (and overpaying, he thought, at that), however, he and Chaklos decided the State could do better.

In addition to their duties with ISP, Chaklos and Wist owned and operated Midwest Forensic Services, Inc. (MFS). After the State's no-bid contract with NFSTC was published online pursuant to the State of Illinois Department of Central Management Services (CMS) procedures, Chaklos and Wist submitted a protest letter to Michael Yokley, an ISP procurement official. The letter was on MFS stationery and signed by Wist as President of MFS and Chaklos as Vice President. The first line of the letter stated that "[MFS] must protest the awarding of a no-bid contract to NFSTC for the training of Personnel in DNA analysis." The letter also stated that MFS could provide superior training at a lower cost "with substantial savings to the State of Illinois" and includes attached documentation regarding available space for the training, a letter of credit from a bank, and a proposed training outline. The letter also suggested problems with NFSTC, specifically indicating that NFSTC did not have the requisite experience to handle the training.

The letter did not have the effect its authors might have hoped. Rather than raising concerns about the no-bid

contract, the letter raised concerns within ISP about Chaklos and Wist, and ISP launched an internal investigation into their work with MFS. ISP suspended plaintiffs for thirty days for writing the letter on the ground that the letter violated ISP's policy regarding secondary employment. Michael Sheppo, along with Stevens, Metzger, and Vondrak, made this decision. Despite the protest, ISP proceeded with its plan to send the scientists to NFSTC.

As it turns out, however, Chaklos and Wist were not the only ISP employees with dual interests in this matter. Michael Sheppo, who was the Commander of ISP's Forensic Sciences Command, was also President of the NFSTC's Board of Directors. His involvement was known to several employees at ISP (including Stevens), and some ISP employees had raised concerns about a potential conflict of interest when NFSTC was being considered for the training services contract. An initial investigation led nowhere (based largely on the misleading representations of Sheppo and Stevens), but after the Office of Executive Inspector General (OEIG) received a formal complaint regarding NFTSC, it opened a full investigation into Sheppo's involvement with NFSTC. It determined that Sheppo's position with NFSTC created a conflict of interest. It also concluded that Sheppo's role in plaintiffs' discipline was unethical and recommended that their suspensions be rescinded.

Maintaining that their protest letter was protected speech, Chaklos and Wist filed a First Amendment retaliation suit under 42 U.S.C. § 1983. The district court deter-

mined that although the letter was protected speech, defendants were entitled to qualified immunity. Chaklos and Wist now appeal from the entry of summary judgment against them.

## II. ANALYSIS

We review the district court's grant of summary judgment de novo. *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 720 (7th Cir. 2008). Summary judgment is proper only if "there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

### A. Standing

Before addressing the merits of this case, we consider defendants' challenge to plaintiffs' standing, which defendants raise for the first time on appeal. According to them, MFS wrote the letter and therefore has the First Amendment right in this case, though it is not a party to the suit. Chaklos and Wist are trying to litigate MFS's rights rather than their own, defendants assert, and to the extent that plaintiffs suffered an injury, that injury did not affect MFS.

We need not dwell long on this issue. To have standing, an individual must have suffered an "injury in fact" that is "fairly traceable to the challenged action." *Sierra Club v. Franklin County Power of Illinois, LLC,* 546 F.3d 918, 925 (7th Cir. 2008). Chaklos and Wist wrote a letter protesting the

award of a no-bid contract. They signed their names and indicated their respective positions at MFS. Defendants punished plaintiffs themselves for writing this letter by suspending them, which means plaintiffs suffered an injury resulting from defendants' action. As defendants conceded at oral argument, a corporation acts through its human members, and defendants cite no authority for their argument that the corporate form (MFS) should be divorced from its human members (Chaklos and Wist) for purposes of this inquiry. As a result, we are satisfied that Chaklos and Wist have standing.

## B. Qualified Immunity Standard

Governmental actors performing discretionary functions enjoy qualified immunity and are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

At the time this case was argued, *Saucier v. Katz* mandated a sequential procedure for considering whether state actors are entitled to qualified immunity. 533 U.S. 194, 201 (2001). We were required first to determine whether the facts, taken in the light most favorable to plaintiffs, would allow a reasonable fact finder to determine that they have been deprived of a constitutional right. *Katz*, 533 U.S. at 201. Only if plaintiffs met that burden would we then determine whether the particular constitutional right

was "clearly established" at the time of the alleged violation. *Id.*

The Supreme Court recently reconsidered *Saucier* and decided "that while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009). Although it recognized situations in which the *Saucier* approach is beneficial, the Court concluded that the judges of the district courts and the courts of appeals could exercise their discretion in deciding which of the two prongs to address first. *Id.*

Deciding the constitutional question first is beneficial when courts are able to clarify or elaborate on the law in a manner that promotes its development. *See Saucier*, 533 U.S. at 201 (explaining that the threshold inquiry is intended to "set forth principles which will become the basis for a holding that a right is clearly established" in later cases). But where "the constitutional question is so fact-bound that the decision provides little guidance for future cases," a forced resolution of the constitutional question is neither necessary nor prudent. *Pearson*, 129 S. Ct. at 819. This case presents a paradigmatic example of such a case. As discussed further below, the quirky facts of this case complicate the constitutional inquiry. It is far from obvious whether the speech in this case is constitutionally protected and we do not think resolving the First Amendment issue serves any jurisprudential purpose. Because defendants did not violate clearly established law, we do not decide whether the facts established a constitutional violation.

### 1. First Amendment Retaliation

Chaklos and Wist claim they were retaliated against and suspended, in violation of their First Amendment rights, in response to their letter protesting the award of a no-bid contract to NFSTC. A First Amendment retaliation claim involves a three-step analysis: "First, we must determine whether the employee's speech was constitutionally protected. Second, the plaintiff must establish that the speech was a substantial or motivating factor in the retaliatory action. Third, the defendant has an opportunity to establish that the same action would have been taken in the absence of the employee's protected speech." *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004). Defendants do not dispute that they suspended plaintiffs for their speech so the inquiry turns on whether that speech is protected by the First Amendment.

### a. *Garcetti* does not apply.

A public employee has a protected right, in certain circumstances, to speak as a citizen addressing matters of public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). However, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. *Garcetti* requires a threshold determination regarding whether the public employee spoke in his capacity as a private citizen or as an employee. *Renken v. Gregory*, 541 F.3d 769, 773 (7th Cir. 2008).

Plaintiffs signed their letter as employees of MFS, an outside company. They did not complain to their own supervisors about matters relating to their jobs.    *Cf. Renken,* 541 F.3d at 773. So we do not agree with defendants that Chaklos and Wist submitted their letter as part of their official duties. Defendants nevertheless insist that Chaklos and Wist wrote the letter pursuant to their job duties because they had a duty to report their concerns about the no-bid contract under the Illinois Procurement Code, 30 ILCS 500/50-40. That provision addresses the reporting of "anticompetitive practices" and states:

> When, for any reason, any vendor, bidder, contrac-tor, chief procurement officer, State purchasing officer, designee, elected official, or State employee suspects collusion or other anticompetitive practice among any bidders, offerors, contractors, propos-ers, or employees of the State, a notice of the relevant facts shall be transmitted to the Attorney General and the chief procurement officer.

That ISP employees may have this general duty does not by itself mean that all speech made by Chaklos and Wist regarding anticompetitive practices was necessarily made pursuant to their job duties. Indeed, plaintiffs did not submit their concerns to the Attorney General or the chief procurement officer as directed by the code. Furthermore, in *Garcetti*, the Supreme Court rejected the idea "that employers can restrict employees' rights by creating excessively broad job descriptions." 547 U.S. at 424. "Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform,

and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Id.* Plaintiffs were employed as scientists, and defendants do not demonstrate that they *expected* Chaklos and Wist to write this letter protesting the no-bid contract and proposing to provide the training services themselves.

That said, it is unnecessary to decide in this case whether, if a state limits moonlighting by employees, it may curtail bid protests that are designed to direct state business in the direction of workers subject to that limit. *Cf. Broadrick v. Oklahoma*, 413 U.S. 601 (1973). Defendants have not argued that Illinois has a general rule limiting the steps that public employees may take in pursuit of additional business within the state.

### b. The letter addressed a matter of public concern.

Having concluded that *Garcetti* does not immunize defendants' actions here, we turn to whether the protest/proposal letter addressed a matter of public concern. Whether a statement rises to the level of public concern is a question of law, and in answering this question we look to the "content, form, and context" of the statement. *Connick v. Myers*, 461 U.S. 138, 147-48, 148 n.7 (1983). Then we balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its

employees." *Schad v. Jones*, 415 F.3d 671, 674 (7th Cir. 2005) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). The combination of these two inquiries is called the *Connick-Pickering* test. *Schad*, 415 F.3d at 674.

It is by now well established that speech protesting government waste addresses a matter of public concern and is therefore entitled to constitutional protection. *See, e.g., Wainscott v. Henry*, 315 F.3d 844, 849 (7th Cir. 2003) ("An employee's ability to highlight the misuse of public funds or breaches of public trust is a critical weapon in the fight against government corruption and inefficiency."); *see also Miller v. Jones*, 444 F.3d 929, 935 (7th Cir. 2006). Competitive bidding for state contracts might prevent government waste by ensuring that the state is getting the most for its money. Generally speaking, when vendors compete for state dollars, taxpayers benefit.[1]

Chaklos and Wist's letter protests ISP's award of a sole source contract to NFSTC on the basis that the State could save itself money by soliciting competitive bids. The matter challenged (the use of public funds) is a matter of public

---

[1] The Illinois Procurement Code states that it is the policy of Illinois that "the principles of competitive bidding and economical procurement practices shall be applicable to all purchases and contracts by or for any State agency." 30 ILCS 500/1-5. To that end, if the State plans to enter into a contract without competitive bidding (a "sole source" contract), it must make public its intent to do so and allow fourteen days for a challenge from another vendor before executing that contract. Ill. Admin. Code tit. 44, § 1.2025.

interest, and we find it hard to imagine the residents of Illinois would not be concerned with the State awarding a $750,000 contract for services to an out-of-state organization without shopping around. Additionally, the letter suggests that NFSTC did not have adequate experience to handle the training of the new scientists because its prior training programs always relied on outside instructors.

The letter goes on to state that plaintiffs' company (MFS) could "provide the training at lower cost and, thus, with substantial additional savings to the State of Illinois." Defendants seize upon this language to characterize the letter as a self-interested bid for a service contract with the State. They maintain that plaintiffs' offer to provide training services and the specifics of their proposal demonstrate that the "point" of the letter was not to expose wrongdoing on the part of the State but rather to further plaintiffs' purely private interest in securing the contract for their own company. *See, e.g., Kokkinis v. Ivkovich,* 185 F.3d 840, 844 (7th Cir. 1999).

This would likely be a simpler case if the letter simply lodged a protest regarding the award of a "no-bid" contract without also soliciting the contract. Speech that addresses "a private or personal interest, as opposed to a community one, does not satisfy the standards for First Amendment protection." *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004). However, we must look at the content of the speech as a whole, *Gazarkiewicz v. Town of Kingsford Heights, Indiana*, 359 F.3d 933, 942-43 (7th Cir. 2004), and in doing so, we conclude that this letter addresses a matter of public concern. It protests inefficient spending of public

funds on a service contract and contends that the State could save itself money by soliciting competitive bids. *By itself*, plaintiffs' proposal may not address a matter of public concern, but we do not agree with defendants that this aspect of the letter nullifies the remainder of the letter which does address a matter of public concern. *See, e.g., Connick*, 461 U.S. at 149 (speech addressed a matter of public concern where only one question out of fourteen related to a matter of public concern). Furthermore, the details of the proposal demonstrate just how wasteful the decision to award the contract without soliciting competitive bids would be—the letter indicates plaintiffs would save the State of Illinois roughly $200,000.

Defendants also argue that plaintiffs' self-serving motives outweigh the public importance of the speech. As an initial matter, we note that content remains the most important factor in determining whether speech addresses a matter of public concern. *See Cliff v. Bd. of Sch. Comm'rs of City of Indianapolis, Ind.*, 42 F.3d 403, 410 (7th Cir. 1994) (cautioning against using a speaker's motive as "an absolute litmus test [to] supplant content in terms of overall importance to the public concern inquiry."). Although we consider the motive of the speaker as part of the "context" in which the speech was made, *see Miller*, 444 F.3d at 937, "we have emphasized that speech of public importance is only transformed into a matter of private concern when it is motivated *solely* by the speaker's personal interests." *Gazarkiewicz*, 359 F.3d at 942 (emphasis in original).

That is not the case here. Plaintiffs may have been motivated in part by some personal interest but they also

were concerned that the State was wasting money and that NFSTC did not have adequate experience to handle the training.[2] Recall that NFSTC was supposed to remedy ISP's lack of forensic scientists so it could begin to process its DNA backlog. Given that ISP had decided to grant the contract to an organization that (according to plaintiffs) was not equipped to deal with a problem that had attracted significant public attention, we find that the circumstances in which Chaklos and Wist protested the no-bid award demonstrate that the speech was not based on a "purely personal interest."

For these reasons, we find plaintiffs' letter addressed a matter of public concern and was not motivated solely by personal interests.

### c. Balancing of interests

But that does not end our inquiry. The government is entitled to restrict speech that addresses a matter of public concern "if it can prove that the interest of the employee as a citizen in commenting on the matter is outweighed by the interest of the government employer in promoting effective

---

[2] The OEIG's report suggests these concerns may have been legitimate. The report documents the concerns of ISP employees who felt, after the training had occurred at NFSTC, that "the decision to use NFSTC instead of conducting the training in-house resulted in a huge waste of state resources." Those employees expressed several problems with NFSTC's training and indicated that they would not recommend sending more scientists to NFSTC in the future.

and efficient public service." *McGreal v. Ostrov*, 368 F.3d 657, 675-76 (7th Cir. 2004); *Pickering*, 391 U.S. at 574. We have identified seven related factors to be considered as part of the *Pickering* analysis: (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place, and manner of the speech; (5) the context within which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public. *McGreal*, 368 F.3d at 675-76. Defendants bear "the burden of justifying a particular disciplinary action, and a stronger showing may be necessary when an employee's speech more substantially involves matters of public concern." *Id.* at 681-82.

Defendants' main argument is that their interest in making sure ISP avoids "apparent" conflicts of interest and enforcing ISP's policy against secondary employment outweighs plaintiffs' speech interest. They submit that plaintiffs' work at MFS conflicted with their duties as employees of ISP. To determine whether defendants violated the First Amendment, we must weigh this interest against plaintiffs' interest in protesting government waste.

Although the proper balance of these competing interests is a question of law, *Wainscott*, 315 F.3d at 851, we do not think the law makes clear whether plaintiffs' interest outweighs defendants' interest in this case. A complication

arises from the dual purpose of the letter. Although the letter touched upon a matter of public concern, it did so only in part. The remainder of the letter (which proposes to provide training services) does not touch upon a matter of public concern.

Defendants contend that the proposal was disruptive. There are problems with this argument. To begin, defendants provide no evidence regarding the actual disruptive effect of the letter other than their bald assertion that it surprised people. Although we must give "substantial weight to government employers' reasonable predictions of disruption," in order to be "reasonable" the predictions must be "supported with an evidentiary foundation and be more than mere speculation." *Gazarkiewicz*, 359 F.3d at 944. In fact, the OEIG report indicates that seeking competitive bids for the training contract would not have slowed the training process substantially. Rather than demonstrating that the letter disrupted ISP's plans, the record indicates that defendants did not seriously consider Chaklos and Wist's protest *or* proposal, and that NFSTC was awarded the contract without further ado (and without competition).[3]

---

[3] Most of defendants' evidence of disruption is similarly speculative. For example, defendants complain that if plaintiffs had been awarded the contract, plaintiffs would have left their jobs at ISP, that plaintiffs did not have a permit to develop MFS's training programs, and that allowing MFS to train the new scientists would create a conflict of interest for plaintiffs. Critically, however, defendants present no evidence that MFS

(continued...)

Nor are defendants able to identify any law or policy that forbids such a proposal. Instead, they rely on policies prohibiting unapproved secondary employment even though, according to plaintiffs, their work at MFS was approved by ISP.[4] It is undisputed that ISP allows its employees to engage in approved secondary employment. And to the extent that defendants believed bidding for a state contract while employed by ISP created the "appearance of an impropriety," their argument that this created a disruption is undermined by Sheppo's involvement with NFSTC (the other contender to whom the State was going to award the contract without soliciting competing bids). The fact that defendants acted on this concern on certain occasions and not others indicates that the concern is not legitimate.[5] *See McGreal*, 368 F.3d at 680 (disparate treatment of similar behavior raises a genuine issue as to

---

[3] (...continued)
actually would have received the contract, thereby validating defendants' fears regarding conflicts of interest or secondary employment.

[4] Defendants dispute this, maintaining that Wist's work at MFS fell outside the scope of his permit, but at this stage of the proceedings we accept Wist's version of the facts.

[5] We note further that Sheppo, unlike Chaklos and Wist, was involved with a company that actually *received* the state contract while employed by ISP, and this seems to have raised no problems for defendants. According to the OEIG report, Sheppo was also heavily involved with the decision to train the scientists off-site rather than in-house, which is significantly more disconcerting than Wist's peripheral discussions regarding the training options.

whether an employer is actually acting out of a fear of potential disruption rather than out of displeasure with the content of an employee's statements).

These factual problems weigh in favor of Chaklos and Wist. But if there had been no mention of a "protest" in the letter, defendants might have acted within their right to suspend plaintiffs for making such a proposal, even if their reason for doing so was erroneous or unreasonable. *See Connick*, 461 U.S. at 146 ("When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment."). Plaintiffs' proposal did not touch on a matter of public concern and they provide no case law demonstrating that they have a constitutional right to make such proposals while employed by the State.

"For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks omitted). Should it have been sufficiently clear to defendants that they could not punish Chaklos and Wist for their letter without violating the Constitution? We think not. It is clear, as plaintiffs maintain, that a public employer may not retaliate against an employee who exercises his First Amendment speech rights. *See Miller*, 444 F.3d at 939; *McGreal*, 368 F.3d at 683. But, as this discussion demonstrates, the letter's entitlement to First Amendment

protection is not obvious. If the letter's only purpose was to lodge a complaint against the no-bid contract, we would have no difficulty concluding, in this case, that defendants should have known their actions were unconstitutional. But in light of the unusual circumstances of this case, which include the dual nature of the letter at issue, the State's split-the-baby approach toward secondary employment, and defendants' questionable enforcement of the State's policies, we think it unnecessary to determine whether this letter is constitutionally protected, and thus whether defendants' actions were unconstitutional.

In so holding, we emphasize that plaintiffs did not need to present a case involving a "protest/proposal letter." The question is not whether there is a prior case "on all fours" with the current claim. *McGreal*, 368 F.3d at 68; *Hope*, 536 U.S. at 741 ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."). But plaintiffs' cases regarding the impropriety of First Amendment retaliation in general do not provide fair warning to defendants that their conduct was unconstitutional. As the Supreme Court recognized in *Hope*, "general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" 536 U.S. at 740 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). This case falls into the former category so defendants are entitled to qualified immunity.

### III. CONCLUSION

The judgment of the district court is AFFIRMED.