In the

# United States Court of Appeals

### For the Seventh Circuit

No. 06-1599

RONALD MATRISCIANO,

*Plaintiff-Appellant*,

*v.*

MICHAEL P. RANDLE, Director of the Department
of Corrections of the State of Illinois, and
DONALD SNYDER,

*Defendants-Appellee*s.

Appeal from the United States District Court
for the Central District of Illinois.
No. 03-3072—**Richard Mills**, *Judge*.

ARGUED NOVEMBER 6, 2006—DECIDED JUNE 26, 2009

Before RIPPLE, WILLIAMS, and SYKES, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. After an Assistant Deputy Director in the Illinois Department of Corrections voluntarily testified at a Prisoner Review Board hearing in support of an inmate's release, his employer transferred him to another role in the Department. He maintains that doing so violated the rights guaranteed to him by

the First Amendment to the United States Constitution. At the time of the transfer, however, it was not clearly established that the employer's action violated any constitutional rights. As a result, the defendants are entitled to qualified immunity, and the district court's grant of summary judgment is affirmed.

## I. BACKGROUND

On this appeal from the grant of summary judgment in the defendants' favor, we recount the evidence in the summary judgment record in the light most favorable to the plaintiff. *See Burnett v. LFW, Inc.*, 472 F.3d 471, 477 (7th Cir. 2006). During the time period relevant to this case, Donald Snyder was the director of the Illinois Department of Corrections (IDOC). George DeTella, the Department's Associate Director, reported to Snyder. DeTella's direct reports included the Deputy Directors for each of the Department's five districts. Underneath them were the Assistant Deputy Directors in each of the districts, one of which was the plaintiff.

Ronald Matrisciano began working for the IDOC in September of 1980. He was promoted several times and, on July 1, 2002, rose to the level of Assistant Deputy Director. An Assistant Deputy Director was responsible for supervising the wardens and other administrative personnel in his district. The Assistant Deputy Director job description outlines its various functions, including "develops policies and procedures regarding program area[s]" and "makes recommendations for new programs and projects." The Deputy Director in Matrisciano's

district passed away on the same day Matrisciano assumed the Assistant Deputy Director role, and the Deputy Director role remained vacant throughout the time Matrisciano served as Assistant Deputy Director.

Before rising to the level of Assistant Deputy Director, Matrisciano had been assigned the task of ensuring inmate Harry Aleman's safety during his transfer from the federal prison system to the Joliet IDOC facility in July of 2000. Aleman had been tried in 1977 for a murder that occurred in 1973 but was found not guilty. He was later convicted of violating federal racketeering laws as well as transporting stolen goods across state lines. In addition, years after his murder acquittal, federal investigators discovered that the judge presiding over his murder trial had received a $10,000 bribe from Aleman. Aleman was retried in 1993 for the 1973 murder, found guilty, and sentenced to 100 to 300 years in prison. *See People v. Aleman*, 729 N.E.2d 20 (Ill. App. Ct. 2000).

Aleman was housed at the Joliet facility for six months after his transfer there. During that time, Matrisciano visited the Joliet facility two or three times a month to address inmates' concerns and issues regarding the facility, and he met with Aleman during those visits. Aleman's family members also contacted Matrisciano to convey concerns. With Aleman coming up for parole, Aleman and his grandson asked Matrisciano if he would speak at a parole hearing before the Prisoner Review Board on Aleman's behalf.

A Board hearing was originally scheduled for March of 2002. That January, Matrisciano says that he informed

IDOC Director Snyder and Associate Director DeTella of his intent to testify at a Prisoner Review Board hearing. Matrisciano also states that he told members of the Board in March of 2002 that he planned to testify at a hearing, and that none objected. The hearing was rescheduled and did not take place until December 17, 2002. After the date was rescheduled, Matrisciano says that he again informed Snyder and DeTella of his intent to testify at a hearing. Although DeTella acknowledges that he knew before the hearing that Matrisciano planned to testify, Snyder maintains that he did not know until after the fact. Matrisciano prepared a statement before his testimony and had attorney Nancy Miller, the IDOC Chief of the Bureau of Operations, review it. Most of the information that Matrisciano used to prepare his statement came from the inmate himself, and he also gathered information from the case file and family members.

At a meeting with Board members prior to the hearing in question, DeTella told Board members including the Chair that an Assistant Deputy Director would be testifying before the Board concerning a high-profile case and asked whether the Chair viewed that as a problem. The Chair said she did not. On December 17, 2002, Matrisciano took the day off from work as a personal day and testified before the Board. He read his prepared two and a half page statement, which began with a description of the numerous capacities in which he had served during his twenty-two years at IDOC, including his current position as the Assistant Deputy Director for District One. He noted that this testimony

marked the first time in his career that he had testified in support of an offender's release on parole and said that he was doing so on behalf of Aleman because of his "strong conviction" that Aleman posed no threat if released. In addition, Matrisciano said that "[s]peaking in [his] professional capacity," he believed that Aleman had been a model inmate, and that in his "professional opinion, it would serve no penological purpose to incarcerate him further." His statement ended by saying, "for the first and only time in my professional career, I appear before the Board and humbly request to grant Harry Aleman his release to parole." Matrisciano maintains that he also made comments that were not in his prepared statement, namely that he told the Board that he was not at the hearing in his capacity as the Assistant Director. Nonetheless, he signed the statement, "Ronald Matrisciano, Assistant Deputy Director, Illinois Department of Corrections."

Within the next few days, Matrisciano says that he called Snyder and informed him he had testified before the Board. On December 24, 2002, Snyder told DeTella about media inquiries regarding Matrisciano's testimony and said that Matrisciano had "screwed up." Snyder directed DeTella to reassign Matrisciano to oversee the final construction phases at the Stateville Reception and Classification Center, which was not yet open and had no inmates.

Matrisciano was reassigned to the Stateville facility on December 27. He retained his job title and salary, but his duties and responsibilities changed. He remained in this

position until IDOC laid him off on May 30, 2003 as part of a department-wide restructuring that eliminated Assistant Deputy Directors and their staff. Matrisciano was eventually recalled from a layoff list but was "locked out" pending an investigation concerning his testimony before the Board. Matrisciano was placed on paid administrative leave with full pay.

The district court granted the defendants' motion for summary judgment on Matrisciano's claim of First Amendment retaliation, and Matrisciano appeals.[1] The defendants' brief on appeal notes that about three years after Matrisciano's testimony in front of the Board, state court charges were brought against him alleging official misconduct in connection with his testimony before the Board and perjury during his deposition in this case. After oral argument in this case, Matrisciano went to trial and was found not guilty on all counts.

## II. ANALYSIS

Matrisciano maintains that summary judgment should not have been granted against him on his claim that the defendants retaliated against him for engaging in speech protected by the First Amendment. We review the district court's grant of summary judgment in the

[1] The district court concluded that Matrisciano had abandoned a claim that he should have been recalled earlier, and he does not challenge that determination or argue for any injunctive relief on appeal.

defendants' favor de novo. *Chaklos v. Stevens*, 560 F.3d 705, 710 (7th Cir. 2009). Summary judgment is proper only if "there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

### A.  Qualified Immunity

The defendants contend, as they did in their request for summary judgment in the district court, that summary judgment was proper on the merits of the First Amendment claim and also that they are entitled to qualified immunity. Matrisciano argues that the defendants should not be permitted to raise qualified immunity on appeal because the district court did not address qualified immunity in its order granting summary judgment and the defendants did not file a cross appeal. As support, he points to the rule that without a cross appeal, an appellee may not "'attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary, whether what he seeks is to correct an error or to supplement the decree with respect to a matter not dealt with below.'" *United States ex rel. Stachulak v. Coughlin*, 520 F.2d 931, 937 (7th Cir. 1975) (quoting *United States v. Amer. Ry. Express Co.*, 265 U.S. 425, 434 (1924)); *see also Alejo v. Heller*, 328 F.3d 930, 937 (7th Cir. 2003). The defendants are not attempting to enlarge any rights beyond those conferred by the district court's grant of summary judgment in their favor, however. Instead, their qualified immunity argument is simply an alternative argument they make

for upholding the summary judgment decision. The defendants argued that they were entitled to qualified immunity in their memorandum in support of their motion for summary judgment, so there is no question that they may make this argument again on appeal. *See Stachulak*, 520 F.2d at 937 (stating that without a cross appeal, an appellee may argue in support of the judgment any argument in the record, even if the lower court ignored it); *cf. Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 391 n.1 (7th Cir. 2007) (noting some tension in case law as to whether appellee who did not make a particular argument in the district court could make it for the first time on appeal).

Government officials performing discretionary functions enjoy qualified immunity shielding them "'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Supreme Court has described qualified immunity as balancing two interests—"the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* In its decision in *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court had mandated a two-step analysis for courts to undertake when addressing claims of qualified immunity. First, the court had to determine whether a constitutional right had been violated under the facts alleged or shown. *See id.* at 201; *see also Chaklos*,

560 F.3d at 711. If that hurdle was satisfied, the court would next determine whether the particular right was "clearly established" at the time of the alleged violation. *See Saucier*, 533 U.S. at 201. If the right was not clearly established, qualified immunity applied. *Id.*

More recently, however, the Supreme Court has decreed that the *Saucier* two-step sequence is no longer mandatory. *Pearson*, 129 S. Ct. at 818. Instead, district and appellate court judges can exercise their discretion to determine which prong of the qualified immunity test will be addressed first. *See id.* In this case, as we will explain, we conclude that it was not clearly established at the time of Matrisciano's transfer that doing so violated his First Amendment rights. Accordingly, the defendants are entitled to qualified immunity.

### B. First Amendment Retaliation

Although we ultimately decide this case on account of the failure to meet the "clearly established" requirement, some examination of the alleged constitutional right that was violated is helpful in understanding whether such a right was clearly established at the relevant time. Matrisciano argues that the defendants retaliated against him, in a manner contrary to the protections guaranteed by the First Amendment, by reassigning him after he testified before the Prisoner Review Board in support of Aleman's release. To establish a prima facie case of retaliation under the First Amendment, a plaintiff must show that: (1) his speech was constitutionally protected; (2) he suffered a deprivation likely

to deter free speech; and (3) the speech was at least a motivating factor behind the adverse action. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). The defendants do not contest whether Matrisciano suffered a deprivation likely to deter free speech.[2]

### 1. Motivating Factor

Viewing the evidence in the light most favorable to Matrisciano as we must at this stage, there is sufficient evidence in the record that the reassignment was at least in part on account of Matrisciano's testimony before the Prisoner Review Board. There is evidence in the record that a few days after the testimony, Director Snyder telephoned Associate Director DeTella and told him that Matrisciano had "screwed up" and that something had to be done. DeTella further stated that in the days after Matrisciano's testimony, Director Snyder told him the media had been calling regarding Matrisciano's testimony and that Matrisciano would have to be disci-

---

[2] A case brought under 42 U.S.C. § 1983 alleging First Amendment retaliation does not require a plaintiff to show an "adverse employment action." *Spiegla v. Hull*, 371 F.3d 928 (7th Cir. 2004). Rather, any deprivation likely to deter free speech is sufficient. *Id.* Here, the reassignment to a facility where no inmates were housed, which DeTella considered a demotion, suffices. *See Miller v. Jones*, 444 F.3d 929, 939 (7th Cir. 2006) (prohibition on retaliation against public employees who exercise First Amendment speech rights "extends to retaliatory transfers to a less desired position").

plined. Moreover, Snyder said in his deposition, "It's not every day that we have a high ranking official with the Illinois Department of Corrections go and testify for a mob hit man. And so I reassigned Mr.—Ron to the RNC at Stateville." A jury could find that the speech was a motivating factor behind the reassignment.

### 2.   Constitutionally Protected Speech

The next and larger question is whether Matrisciano's speech before the Board was constitutionally protected. Public employees do not surrender all of their First Amendment rights by accepting employment with the government. *See Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). Instead, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen about matters of public concern. *Morales v. Jones*, 494 F.3d 590, 595 (7th Cir. 2007). Whether the First Amendment protects the speech is a question of law that we review de novo. *Williams v. Seniff*, 342 F.3d 774, 782 (7th Cir. 2003).

#### a.  Speaking as citizen on matter of public concern

If a public employee does not speak as a "citizen," the First Amendment does not protect that speech. *See Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008). As a result, an inquiry often arises into whether an employee spoke as a citizen. The Supreme Court has explained that "when public employees make statements *pursuant to their official duties*, the employees are not

speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) (emphasis added); *see also Spiegla*, 481 F.3d at 966. Matrisciano voluntarily testified before the Board on a day that he took off from work. His job description does not hint at voluntary testimony before the Board. In short, we find no evidence that Matrisciano spoke to the Board pursuant to his official duties, and the defendants do not argue otherwise. *Cf. Fairley v. Fearmint*, 482 F.3d 897, 902 (7th Cir. 2007) (rejecting argument that jail guard's testimony during inmate's lawsuit constituted speech made pursuant to guard's official duties and stating that "[a]ssistance to prisoners and their lawyers in litigation is not part of a guard's official duties."). The next step in the analysis would be whether Matrisciano spoke on a matter of public concern, as speech that serves only a private or personal interest does not receive First Amendment protection. *See Houskins*, 549 F.3d at 491-92. The defendants do not contest the public concern requirement, however, and we will proceed under the assumption that it has been met.

### b. Policy-maker corollary

A weighing of interests sometimes referred to as "*Pickering* balancing" often follows a determination that a public employee spoke on a matter of public concern. *See Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *see also, e.g., Chaklos,* 560 F.3d at 714. Drawing on principles established in political patronage cases, however, we have said that

the First Amendment "does not prohibit the discharge of a policy-making employee when that individual has engaged in speech on a matter of public concern in a manner that is critical of superiors or their stated policies." *Vargas-Harrison v. Racine Unified School Dist.*, 272 F.3d 964, 971 (7th Cir. 2001). We have not limited this "policy-maker corollary" to instances where the plaintiff's political views led to the adverse action. *See id.*; *Warzon v. Drew*, 60 F.3d 1234 (7th Cir. 1995); *Wilbur v. Mahan*, 3 F.3d 214, 218 (7th Cir. 1993) ("The exception recognized in the patronage cases for sensitive employees . . . retains its force in cases that have nothing directly to do with patronage or party affiliation.").

The defendants argue that the "policy-maker corollary" we discussed in *Vargas-Harrison* applies here, and the district court agreed. We have set forth two requirements for the corollary to apply. First, the employee must have occupied a policy-making position. *See Vargas-Harrison*, 272 F.3d at 972. If so, his speech must have been of the kind that falls within the scope of the corollary. *See id.*

An employee occupies a policy-making position when the position " 'authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation.' " *Vargas-Harrison*, 272 F.3d at 972 (quoting *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir. 1981)); *see also Fuest v. Clarke*, 454 F.3d 770 (7th Cir. 2006). A reliable job description can aid in this determination. *See Riley v. Blagojevich*, 425 F.3d 357, 361 (7th

Cir. 2005). During the relevant time period, Matrisciano held the position of Assistant Deputy Director in the Illinois Department of Corrections. In this role, Matrisciano supervised wardens and assistant wardens. Notably, we have already held that both positions constitute policy-making positions, *see Pierson v. Blagojevich*, 437 F.3d 587, 588 (7th Cir. 2006) (wardens); *Riley*, 425 F.3d at 365 (assistant wardens), and it would seem odd for a policy-maker's supervisor not to qualify as a policy-maker himself. Moreover, the Assistant Deputy Director job description lists responsibilities including: "[r]eviews and audits policies, programs and management practices; makes recommendations regarding changes"; and "develops policies and procedures regarding program area." Although Matrisciano and DeTella may not have viewed Matrisciano as a policy-maker, we have little trouble concluding that the Assistant Deputy Director position was one that fit that description as the term is used in cases such as *Vargas-Harrison*.

The next question is whether the speech at issue falls within the scope of the policy-making corollary. *See Vargas-Harrison*, 272 F.3d at 972. We have stated that the policy-maker corollary " 'does not apply, and the courts must apply *Pickering* balancing, when the speech at issue does not implicate the employee's politics or substantive policy viewpoints.' " *Id.* at 973 (citing *Bonds v. Milwaukee County*, 207 F.3d 969, 979 (7th Cir. 2000)). When a "policy-maker's speech creates a conflict with the policy stance of his superiors, the effects on government are 'acute.' " *Id.* However, "speech unrelated to job duties or political

viewpoint runs too remote from the interests that animate the exception." *Bonds*, 207 F.3d at 979.

The defendants maintain that Matrisciano's speech implicated substantive policy viewpoints. (We left open the question of whether an employer may terminate a policy-making employee for *any* speech without running afoul of the First Amendment, *Vargas-Harrison*, 272 F.3d at 973, and the defendants do not go that far here.) In this case, however, Matrisciano's testimony did not criticize Department of Corrections policy, nor did he criticize any of his superiors. The Department does not profess to have a policy of opposing the release of all inmates, and the defendants do not point to any evidence in the record suggesting that the Department had a policy of opposing the release of this particular inmate. So although Matrisciano was a policy-maker, we cannot find that his speech falls within the scope of the policy-maker corollary we discussed in *Vargas-Harrison*.

### c. *Pickering* balancing

Although we agree with Matrisciano that the policy-maker corollary does not apply, that does not mean that he is home free. "The government is entitled to restrict speech that addresses a matter of public concern 'if it can prove that the interest of the employee as a citizen in commenting on the matter is outweighed by the interest of the government employer in promoting effective and efficient public service.'" *Chaklos*, 560 F.3d at 714 (quoting *McGreal v. Ostrov*, 368 F.3d 657, 675-76

(7th Cir. 2004)). When conducting the "*Pickering* balancing" of the interests of the employee, as a citizen, in commenting upon matters of public concern against the interests of the State, as an employer, in promoting efficient services of its employees, we consider the following factors:

> (1) whether the statement would create problems in maintaining discipline by immediate supervisors or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her daily responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 358 n.7 (7th Cir. 2005).

Unfortunately, Matrisciano's briefs emphasize that the district court erred when it found the policy-maker corollary applied and do not develop an argument as to the balancing of interests. And there are competing interests at stake here. On the one hand, at the time Matrisciano testified, no written policy prohibited Department of Corrections employees from testifying at Prisoner Review Board hearings. Viewing the evidence in the record in the light most favorable to Matrisciano and drawing all reasonable inference therefrom, as we must,

superiors at the Department of Corrections knew at least that Matrisciano would testify before the Prisoner Review Board, even if he did not tell them it was on Aleman's behalf. (The evidence Matrisciano points to in the record contains assertions that Matrisciano told Snyder and DeTella in advance that he planned to testify before the Board, but they do not state that he gave them Aleman's name.)

It might seem, then, that faced with a touchy situation, Matrisciano did what an employer would want its employees to do—he talked to his supervisors. We have commended employees before for attempting to proceed through internal channels. *See Hulbert v. Wilhelm*, 120 F.3d 648, 654 (7th Cir. 1997). And after a principal gave prior approval to a classroom speaker but then fired the teacher when the speaker's visit resulted in parent complaints, the Sixth Circuit stated: "While ordinarily we would give substantial weight to the government employer's concerns of workplace efficiency, harmony, and discipline in conducting our balancing of the employee's and employer's competing interests, we cannot allow these concerns to tilt the *Pickering* scale in favor of the government, absent other evidence, when the disruptive consequences of the employee speech can be traced back to the government's express decision permitting the employee to engage in the speech." *Cockrel v. Shelby County School Dist.*, 270 F.3d 1036, 1054-55 (6th Cir. 2001); *see also Evans-Marshall v. Bd. of Educ. of Tipp City*, 428 F.3d 223, 231-32 (6th Cir. 2005) (allegations that teacher fired after public outcry over pre-approved books and material sufficient to state claim for protected First Amend-

ment activity under *Pickering*); *Victor v. McElveen*, 150 F.3d 451 (5th Cir. 1998) (interests of police department in maintaining harmony and efficiency did not outweigh deputy's right to speak where sheriff gave officer prior assurance he could speak without fear of recrimination). *But see Boring v. Buncombe Cty. Bd. of Educ.*, 136 F.3d 364 (4th Cir. 1998) (en banc) (affirming dismissal of teacher's First Amendment complaint after she was disciplined for having students perform certain play even though she had given principal prior notice of play's name).

It is also true that Department of Corrections employees may have information relevant and helpful to the parole determination. We have recognized before that prison guards may be particularly helpful to a parole board, as "'it is the guards who have daily contact with [the inmate] and therefore can realistically assess his person.'" *See Hall v. Washington*, 106 F.3d 742, 752 (7th Cir. 1997) (quoting *Shimer v. Washington*, 100 F.3d 506, 508 (7th Cir. 1996)). Matrisciano had some contact with Aleman while Aleman was in custody, but he did not have the quantity or type of contact with Aleman as did the prison guards discussed in *Hall* and *Shimer*. Matrisciano, then Deputy Chief of Parole, first met Aleman when he had been assigned to assure Aleman's safety when he was transferred from the federal prison system to the Illinois Department of Corrections in July of 2000. He subsequently visited the Joliet facility two to three times per month to speak with inmates about their concerns regarding the facility, and he says that he met with Aleman during these visits for the six months Aleman remained at Joliet. Unlike a prison guard who observes

inmates on a daily basis, in their normal routines, Matrisciano only visited occasionally and for a particular reason—to hear the inmates express concerns about the facility. And by the time Matrisciano testified before the Board in December 2002, it had been two years since the Joliet visits.

Moreover, the defendants contend that the testimony of a high-ranking Department of Corrections official at the parole hearing of a notorious prisoner calls Matrisciano's judgment into question, and that the Department has an interest in ensuring that its Director has confidence in its high-level employees. *Cf. United States v. Miss. Valley Generating Co.*, 364 U.S. 520, 562 (1961) ("[A] democracy is effective only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions of malfeasance and corruption."). The testimony here marked the first time in Matrisciano's twenty-two years with the Department of Corrections that he had testified at a Prisoner Review Board hearing. This testimony concerned not just any inmate, but rather the infamous Harry Aleman, acquitted of murder thirty years earlier after bribing a judge. And the testimony urging release also came only ten years into Aleman's 100-300 year sentence. The State has legitimate reason to suggest that in light of these circumstances, observers including other IDOC employees could wonder whether Matrisciano's motives for testifying were pure.

Also of note is that Matrisciano spoke voluntarily before the Prisoner Review Board. He did not make his

statement pursuant to a subpoena. *Cf.* 730 ILCS 5/3-3-2(f) ("The Board or one who has allegedly violated the conditions of his parole or mandatory supervised release may require by subpoena the attendance and testimony of witnesses and the production of documentary evidence relating to any matter under investigation or hearing."); *Wright v. Ill. Dep't of Children & Family Servs.*, 40 F.3d 1492, 1505 (7th Cir. 1994) ("[S]urely an employee summoned to give sworn testimony in a judicial proceeding has a compelling interest in testifying truthfully and the government employer can have an offsetting interest in preventing her from doing so only in the rarest of cases."). Rather, he spoke voluntarily, and not just about what he had observed, either—he explicitly requested that the Board release Aleman.

And although the government does not receive the benefit of the "policy-maker corollary," Matrisciano's status as a high level Department of Corrections official is still relevant in the *Pickering* balancing analysis. "When public employees offer their opinions in roles as representatives or employees of the government, the government's interest as an employer is greater than if the speech comes divorced from the employment context, and the second prong of *Pickering* should honor that enhanced interest; however, the employee's speech may qualify as speech by a citizen on a public concern under the first prong of *Pickering* nonetheless." *Bonds*, 207 F.3d at 980. Matrisciano signed the statement with his official title and said that in his "professional capacity," he believed Aleman had been a model inmate, as well as that in his "professional opinion," he did not believe further incarceration would yield any penological purpose.

All of this goes to show that there are considerations on both sides of the *Pickering* equation, and that the circumstances in this case are unique. As we said, we do not have the benefit of adversarial briefing on the question of whether the government's interests outweigh the interests of the employee in this case, which is one reason we are not inclined to decide whether Matrisciano's First Amendment rights were infringed here. *See Pearson*, 129 S. Ct. at 820 (stating that "[t]he lower courts sometimes encounter cases in which the briefing of constitutional questions is . . . inadequate" and noting that resolving constitutional questions in such circumstances can lead to poor decisionmaking).

The more significant reason that we turn to the clearly established prong is that we conclude no clearly established right was violated at the time of the reassignment. "For a constitutional right to be clearly established, its 'contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (quoting *Anderson*, 483 U.S. at 640) (internal citation omitted). In these particular circumstances, the law at the time was not such that reasonable officials would know that transferring Matrisciano after his testimony before the Board was unlawful.

The Supreme Court has emphasized that the qualified immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier*, 533 U.S. at 206). In *Brosseau*, the Court reversed an appellate court determination that "general tests" set forth in the Court's Fourth Amendment jurisprudence gave officials fair warning that their conduct was unlawful. *Id.* at 199. The Court made clear that the general tests were not enough to give fair warning, nor was it an "obvious case" where general standards clearly established the answer without developed case law. *See id.*

This is also not an obvious case. Aleman was an infamous prisoner known to have bribed a government official, and an Assistant Deputy Director in the Department of Corrections voluntarily made his first Prisoner Review Board comments on behalf of that inmate, without any special knowledge of the inmate's daily behavior in custody. None of the cases to which Matrisciano points put the defendants on notice that reassigning him as a result of this testimony violated the Constitution.

Matrisciano emphasizes our decision in *Shimer v. Washington*, 100 F.3d 506 (7th Cir. 1996), but that case does not help him. First, we did not find a constitutional violation in *Shimer*. Instead, we concluded that the record presented material questions of fact as to whether the Department of Corrections' unwritten policy against allowing employees to testify before the Board was reasonably related to a legitimate penological interest. *Id.* at 510. We also emphasized the daily contact prison guards have with

inmates and suggested that as a result, guards might be in a position to present a realistic assessment of an inmate to the Board. *Id.* at 508. Here, even putting aside that Matrisciano's role was not one of daily interaction with inmates, the important point is that we did not rule in *Shimer* that the Department's policy violated the First Amendment. The other decision to which he points, *Hall v. Washington*, 106 F.3d 742, 752 (7th Cir. 1997), quotes *Shimer* for the proposition that guards with daily contact with inmates can realistically assess them, but it is not a First Amendment case itself. Neither case makes it apparent that the action here was unlawful.

Nor does the "prior approval" line of cases that we discussed demonstrate that the violation of a constitutional right was clearly established. First, the teachers and sheriff's deputy in those cases were lower-level employees, so they do not make apparent what action an employer cannot take against a high-level employee in whom trust and sound judgment are especially important. *See Bonds*, 207 F.3d at 981 (finding decision to rescind offer of policy-making position did not violate First Amendment where plaintiff's speech had undermined plaintiff's credibility and embarrassed employer). Significantly too, the evidence on which Matrisciano relies does not suggest that Snyder, or even DeTella, approved what would be said at the hearing. Instead, the evidence to which Matrisciano points reflects that under his version of the circumstances, at best, he told them he planned to testify at a Board hearing. Because the violation of a constitutional right was not clearly established at the relevant time, the defendants are entitled to qualified immunity.

## III. CONCLUSION

For the foregoing reasons, the grant of summary judgment in favor of the defendants is AFFIRMED.